OPINION
{¶ 1} Appellants, Ernestine Jackson and Dara Jackson, appeal from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, overruling their objections to the magistrate's decision and granting custody of R.N. and R.C. to appellees, William and Elyria Lee. Because the trial court committed no reversible error, we affirm.
 {¶ 2} R.N. and R.C., the minor children of Marisa Jackson and Scott Stone, Jr., were orphaned on July 5, 1999, when their father murdered their mother and then committed suicide. At the time of their parents' deaths, the girls lived in Michigan with their mother. A Michigan probate court granted temporary custody of the girls to their maternal grandmother, Ernestine Jackson, who later moved them to her residence in Ohio. On August 10, 1999, Ernestine filed an action seeking custody of the girls, along with a motion for an emergency order of custody. The trial court, on August 12, 1999, issued an order naming Ernestine the temporary legal custodian.
 {¶ 3} On October 21, 1999, appellees, William and Elyria Lee, the girls' paternal uncle and aunt who reside in Texas, filed not only a motion requesting that they be made parties to the action, but also a motion for custody. By entry filed October 22, 1999, the trial court joined appellees as parties. Pursuant to appellees' request, the trial court appointed a guardian ad litem ("GAL").
 {¶ 4} On July 27, 2000, Dara Jackson, the girls' maternal aunt, filed a motion requesting that she be made a party to the action and a co-complainant with Ernestine; she also filed an amended complaint for custody. By entry of August 2, 2000, the trial court joined Dara as a party with Ernestine in petitioning the court for custody.
 {¶ 5} The parties appeared before a magistrate and acknowledged, through a "Memorandum of Agreement" filed August 9, 2000, that they had resolved the pending matters before the court. An Agreed Entry was filed with the court on September 18, 2000, journalizing the parties' agreement. The Agreed Entry provided Ernestine was to be the legal guardian effective August 7, 2000, through the last day of the 2000-2001 school year, with Dara becoming custodian if Ernestine became incapacitated or was otherwise unable to care for the girls. Effective the first day of summer vacation following the 2001 school year and until further order of the court, appellees were to be legal custodians. The Agreed Entry also addressed issues related to visitation, communication, transportation, social security payments, health insurance, health care and medical and school records. In addition, the Agreed Entry further provided the GAL would remain active in the matter to file any necessary motions on the girls' behalf and to assist the parties with resolution of disputes related to communication and visitation. The Agreed Entry further specified in paragraph 11, as follows: "[t]his matter shall be reviewed by the Court on June 12, 2002 at 9:30 a.m. in Courtroom 36 in front of Magistrate Palmer." The twelfth and final paragraph of the Agreed Entry stated, "[t]his agreement resolves all pending motions."
 {¶ 6} On January 17, 2001, appellants filed a motion "to modify the schedule of companionship." The motion asserted the terms of the Agreed Entry required the girls to transition annually between appellants and appellees. Appellants argued such an arrangement was not in the girls' best interest; accordingly, they proposed the girls reside with them during the school year and have companionship time with appellees during non-school times. In response, appellees filed a motion to dismiss, arguing the Agreed Entry did not require the girls to alternate between families on a yearly basis. Appellees contended the Agreed Entry provided appellants with custody until the first day of summer vacation 2001, with appellees obtaining custody at that time.
 {¶ 7} On July 17, 2001, appellants filed a motion requesting a stay of the September 18, 2000 order to prevent the girls from moving to Texas; on August 14, 2001, they filed a motion requesting an emergency order of custody. Appellees opposed both motions. By judgment entry filed August 28, 2001, the trial court stayed the September 18, 2000 order until appellants' January 17, 2001 motion was adjudicated. After several continuances, the matter was heard before a magistrate in July and August 2002. The GAL filed a report on August 13, 2002.
 {¶ 8} On May 9, 2003, the magistrate filed a decision including findings of fact and conclusions of law. The magistrate construed the September 18, 2000 order as a final custody determination and appellants' January 17, 2001 motion as a motion to modify custody. Accordingly, the magistrate found the action was subject to the statutory criteria for modifying prior orders set forth in R.C. 3109.04(E)(1)(a). After applying both the change of circumstances and best interest tests set forth in R.C.3109.04(E)(1)(a) to the evidence presented at the hearing, the magistrate denied appellants' motion and revised the September 18, 2000 order to provide appellants would have custody of the girls until the first day of summer vacation following the 2003 school year, at which time appellees would become legal custodians. The trial court adopted the magistrate's decision on May 9, 2003.
 {¶ 9} On May 22, 2003, appellants filed objections to the magistrate's decision and subsequently moved to submit additional evidence at the hearing on the objections. The trial court heard oral argument on the objections, but refused appellants' request to submit additional evidence. At the trial court's request, the GAL interviewed the children regarding their wishes and submitted a supplemental report on October 22, 2003.
 {¶ 10} By decision and entry filed January 22, 2004, the trial court sustained one of the objections, found such action did not substantially affect its ultimate decision, and overruled the remaining objections. The court ordered that the girls move to Texas in the summer of 2004 and begin school there in the fall.
 {¶ 11} Appellants timely appeal the trial court's judgment and assign the following six errors:
1. The Trial Court erred and abused its discretion when, despite its decision finding that the Agreed Entry of September 18, 2000 was a provisional allocation of parental rights, found that this decision did not affect the decision reached by the Court which awards custody of the minor children to the Respondents.
2. The Trial Court erred and abused its discretion when the Court found that the Magistrate in deciding the allocation of parental rights properly employed the standard set forth in R.C.3109.04 as well as the standard set forth in Revised Code Sec.2151.23(A)(2) notwithstanding the Petitioners' argument that the correct standard to employ is set forth in Revised Code Sec.2151.23(A)(2).
3. The Trial Court erred and abused its discretion when it failed to consider all of the evidence necessary to determine whether it was in the best interest of the minor children to remain with the Petitioners.
4. The Trial Court erred and abused its discretion when it failed to consider Petitioners' fourth objection to the Magistrate's decision, and consider that the Magistrate's decision is "stale" in that it is based upon facts and circumstances which at the time of the issuance of the Magistrate's decision were nine months old and also erred when it failed to consider any new testimony concerning the current circumstances of the minor children to appropriately determine the current best interest of the children.
5. The Trial Court erred and abused its discretion by ruling against the manifest weight of the evidence when it found that the Magistrate considered all of the applicable factors as set forth in Revised Code 3109.04(F)(1) in determining that it was in the children's best interest for the Respondents to be designated as the residential parents and legal custodians of the minor children.
6. The Trial Court erred and abused its discretion when it overruled Petitioners' sixth objection to the Magistrate's decision without specifically considering the objection as it related to the Magistrate's finding that a change of circumstance was necessary in order to find that custody of the children should be awarded to the Petitioners.
 {¶ 12} Appellants' six assignments of error reduce to three main issues: (1) whether the trial court utilized the correct standard in making its custody determination; (2) whether the trial court abused its discretion in concluding the girls' best interest would be served by awarding custody to appellees; and (3) whether the trial court abused its discretion in ruling on the objections to the magistrate's decision without considering new testimony concerning the girls' current circumstances.
 {¶ 13} Addressing appellants' first issue, we note that, based on the finding that appellants' January 17, 2001 motion was a motion to modify custody, the magistrate employed the statutory criteria set forth in R.C. 3109.04(E)(1)(a), which governs modification of an existing decree allocating parental rights and responsibilities. R.C. 3109.04(E)(1)(a) requires retention of the previous designation absent the finding of a change in circumstances of the child or the residential parent based upon facts that have arisen since the date of the prior decree or which were unknown at the time of the prior decree. Once the court determines a change in circumstances has occurred, the court may modify the existing decree as necessitated by the best interest of the child. In order to change the designation of the residential parent without the consent of the adverse party, the advantages of the modification must outweigh the potential for harm to the child.
 {¶ 14} Applying R.C. 3109.04(E)(1)(a) to the evidence presented at the hearing, the magistrate concluded there was no change in circumstances to support a modification of the prior order granting custody to appellees, and that even if a change in circumstances had occurred, the girls' best interest would not be served by changing custody to appellants.
 {¶ 15} Appellants objected, arguing the matter was governed by R.C. 2151.23(A)(2) rather than R.C. 3109.04. Appellants maintained R.C. 3109.04 applies only to the allocation of parental rights and responsibilities between parents, and R.C.2151.23(A)(2) applies to custody disputes between nonparents. Accordingly, appellants contended the magistrate erred in relying upon the provisions of R.C. 3109.04 in determining whether there had been a change of circumstances. Appellants claimed the proper standard to be employed in an R.C. 2151.23(A)(2) action is whether the proposed change of custody is in the children's best interest.
 {¶ 16} In its judgment, the trial court noted the magistrate employed the standards set forth in both R.C. 3109.04 and2151.23(A)(2). The court further determined that since appellants sought modification of a prior custody decree, the magistrate did not err in applying R.C. 3109.04.
 {¶ 17} On appeal, appellants contend the trial court erred in finding the magistrate properly employed R.C. 3109.04. Appellants cite In re Bonfield, 97 Ohio St.3d 387, 2002-Ohio-6660, for the proposition that R.C. 3109.04 is inapplicable to custody disputes between nonparents. In Bonfield, the parties, Teri J. Bonfield and Shelly M. Zachritz, lived together as partners in a same-sex relationship. During that time, Teri adopted two children and gave birth to three others through artificial insemination. The parties filed a petition in the juvenile court seeking shared parenting under R.C. 3109.04(A)(2). The juvenile court concluded it did not have jurisdiction to grant the petition because Shelly was not a "parent" within the meaning of R.C. 3109.04.
 {¶ 18} The court of appeals held the juvenile court had jurisdiction to determine the custody of the children under R.C.2151.23(A)(2), but, pursuant to R.C. 2151.23(F)(1), had to exercise its jurisdiction in accordance with R.C. 3109.04. The court concluded R.C. 3109.04 limited the juvenile court's jurisdiction to allocating parental rights and responsibilities to "parents," and since Shelly was not a "parent," the juvenile court had no authority to award parental rights or shared parenting. Accordingly, the court of appeals affirmed the trial court's dismissal of the petition.
 {¶ 19} The Ohio Supreme Court agreed Shelly did not qualify as a "parent" pursuant to R.C. 3109.04; however, the court examined the claim for shared parenting under R.C. 2151.23(A)(2), which grants a juvenile court exclusive jurisdiction "to determine the custody of any child not a ward of another court of this state." Citing Ohio's long standing precedent permitting juvenile courts to adjudicate custodial claims brought by nonparents, the court determined the juvenile court's responsibility to determine custody under R.C. 2151.23(A)(2) could not be avoided merely because Shelly was not a "parent" under R.C. 3109.04. Accordingly, the court held the juvenile court had jurisdiction to determine custody of the children pursuant to R.C. 2151.23(A)(2) without reference to R.C. 3109.04. Having so held, the court clarified the standard to be used by the juvenile court in disposing of the petition upon remand: "the trial court shall exercise its discretion in giving due consideration to all known factors in determining what is in the best interest of the children." Id. at ¶ 49, citing In reAdoption of Charles B. (1990), 50 Ohio St.3d 88, paragraph three of the syllabus.
 {¶ 20} Citing Bonfield, appellants contend the trial court erred in relying upon the provisions of R.C. 3109.04 in determining whether there had been a change in circumstances. Appellants arguably are correct in asserting Bonfield holds that R.C. 2151.23(A)(2), rather than R.C. 3109.04, governs custody disputes when at least one of the parties is a nonparent. Under that premise, the trial court was not required to look for a change in circumstances; rather, the court needed only to conduct a best interest analysis. Even if the trial court in this case initially applied the wrong analysis, appellants suffered no prejudice, as the trial court ultimately addressed the best interest of the girls.
 {¶ 21} In conducting its best interest analysis, the trial court considered the factors set forth in R.C. 3109.04(F)(1). Although appellants have argued Bonfield holds R.C. 3109.04 is inapplicable to custody determinations between nonparents, appellants do not challenge the trial court's consideration of the R.C. 3109.04(F)(1) factors. To the contrary, appellants' third and fifth assignments of error assert the trial court did not properly apply those factors to the evidence at the hearing.
 {¶ 22} Bonfield notwithstanding, the trial court did not err in considering R.C. 3109.04(F)(1) to address the best interest of the girls. Although Bonfield alludes to a best interest standard in R.C. 2151.23(A)(2) custody proceedings involving a nonparent, neither R.C. 2151.23(A)(2) nor Bonfield
sets forth any definitive test or standard to apply in determining the best interest of a child incident to such a proceeding. In our view, when making custodial determinations in such circumstances, a juvenile court should consider the totality of the circumstances, and may, to the extent they are applicable, look to the factors set forth in R.C. 3109.04(F)(1) for guidance. Appellants' first, second and sixth assignments of error are overruled.
 {¶ 23} Appellants' second issue argues the trial court failed to give due consideration to the recommendation of the GAL and the testimony of their expert psychologist, Dr. Dale Wenke, in determining the girls' best interest. Appellants further contend the trial court's finding that it was in the girls' best interest to award custody to appellees is against the manifest weight of the evidence.
 {¶ 24} Because custody issues are some of the most difficult and agonizing decisions a trial judge must make, he or she must have wide latitude in considering all the evidence, and such a decision must not be reversed absent an abuse of discretion.Davis v. Flickinger (1997), 77 Ohio St.3d 415, 418, citingMiller v. Miller (1988), 37 Ohio St.3d 71, 74. A trial court does not abuse its discretion unless its judgment is arbitrary, unreasonable, or unconscionable. Smith v. Smith (July 26, 2000), Athens App. No. 00 CA 07. As noted in Davis, the abuse of discretion standard was applied to custody cases in Bechtolv. Bechtol (1990), 49 Ohio St.3d 21, syllabus, which states: "Where an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the weight of the evidence by a reviewing court. (Trickey v. Trickey [1952], 158 Ohio St. 9, 47.O.O. 481, 106 N.E.2d 772, approved and followed)." Id.
 {¶ 25} At the hearing, evidence was presented through the testimony of several witnesses, including the girls' Michigan nanny, their principal and teachers, their Columbus soccer coach and dance teacher, a family friend from Columbus, their paternal aunt who resides in Texas, appellees' neighbor, both appellants and both appellees. The evidence also included a psychoeducational evaluation by Dr. Linda R. Switkin, the deposition testimony of appellants' expert psychologist, Dr. Dale Wenke, and appellees' educational specialist, Marianne Ambrose. Although the GAL did not testify, she questioned witnesses and submitted a report.
 {¶ 26} The evidence establishes R.N. and R.C. were born in 1991 and 1993, respectively. Following their parents' divorce, the girls moved to Michigan with their mother. While in Michigan, they attended a Montessori school and participated in several extracurricular activities, including violin lessons and soccer. Appellants frequently visited and telephoned the children and had a close and loving relationship with them; appellees had significantly less contact with the children than did appellants. However, the girls often visited their paternal grandparents, who live in Racine, Wisconsin, and had regular weekly telephone contact with them. In addition, the girls occasionally traveled to Texas for visits with their extended paternal family.
 {¶ 27} After their parents' deaths, the children moved in with Ernestine. Dara, who lives near Ernestine in a separate residence, relinquished her career to focus on being the girls' primary caretaker during the daytime. Ernestine initially curtailed traveling associated with her employment and has since become self-employed so she can work from home. Ernestine is primarily responsible for the girls' care during the evening.
 {¶ 28} The children attend St. Joseph's Montessori school ("St. Joseph's") and take dance lessons and Suzuki violin lessons. R.C. plays soccer and R.N. is in the Girl Scouts. Appellants have a close, loving relationship with both girls and are actively involved in all aspects of their lives, including their education. When R.C. experienced academic difficulties during the 2000-2001 school year, appellants worked closely with school officials to address the problem, including requesting she be tutored and tested for learning disabilities. Some concern still exists as to R.C.'s academic development, but her teacher averred R.C. seems to be stabilizing and making progress. Although the girls' teachers are somewhat worried the girls might have some difficulty adjusting to a new school, they both acknowledge the girls seem comfortable with the idea of living with appellees.
 {¶ 29} Appellants arranged counseling for the girls to assist them in coping with their grief. Ron Fox, the girls' initial counselor, eventually released them from counseling, but indicated they might need additional counseling as difficulties arose related to the loss of their parents. When it was determined R.N. needed additional therapy and would respond more positively to "play" therapy rather than conventional "talk" therapy, appellants located a new counselor, Dr. Bethany Shaw, who specializes in "play" therapy.
 {¶ 30} Appellees live in Grapevine, Texas; both are employed fulltime at Abbott Laboratories and have successful, but demanding, careers. Appellees have two teenage sons, ages 16 and 18, both of whom have experienced success in school despite early learning hurdles and are active in school and extracurricular activities. Appellees are actively involved in all aspects of their sons' lives. Although R.N. and R.C. have lived in Ohio since August 1999, they have visited Texas several times and typically spend half of their summer vacation living with appellees. The girls are fond of appellees and have formed a positive, loving relationship with appellees' children. In addition, the girls have a large extended family in Texas, including several aunts, uncles, and cousins with whom the girls interact and socialize during visits. At the time of the hearing, appellees were in the process of making arrangements to enroll the girls in an appropriate school, finding a suitable Suzuki violin instructor, interviewing counselors for the girls, and exploring after-school care options.
 {¶ 31} The evidence reveals some dispute between the parties concerning communication, or lack thereof, between the Stone and Jackson families. For instance, Corliss Stone-Littles, the girls' paternal aunt, testified appellants often refuse to permit the girls to speak to members of the Stone family on the telephone. Elyria testified her telephone conversations with appellants are often strained and less than cordial. Appellants disputed these allegations and asserted the Stones have contacted the girls only sporadically. In addition, Elyria testified appellants did not keep appellees apprised of school and medical issues, in contravention of the September 18, 2000 Agreed Order.
 {¶ 32} Appellants submitted the report of clinical psychologist Dr. Switkin, who performed a psychoeducational evaluation of R.C. in May 2001 at the request of the St. Joseph's staff. Dr. Switkin concluded R.C. functions in the superior range of intelligence with superior verbal comprehension capacities and average abilities in areas of perceptual organization, but performs at least a year below grade level in most areas of reading. Dr. Switkin recommended R.C. continue to attend a Montessori-type school, whether in Columbus or Texas, but expressed concern that R.C. would likely lose another six months' academic development if she moved to Texas and changed schools.
 {¶ 33} At appellants' request, Dr. Wenke commenced an evaluation of R.N. in May and June 2002 and submitted a report of his findings in July 2002. The evaluation consisted entirely of two interviews with R.N. and appellants. Dr. Wenke did not conduct any psychological testing of either R.N. or appellants and had no contact with appellees or either of R.N.'s counselors.
 {¶ 34} Dr. Wenke testified R.N. has adjusted to her Columbus home and feels comfortable, stable, and secure in her relationship with appellants. He further testified that although appellants are two females raising the children, they have adopted traditional mother and father roles with the girls, with Dara assuming the role of mother and Ernestine assuming the role of father. Noting the difficulty R.N. had adjusting to a new school and establishing friendships when she came to Columbus in 1999, he expressed concern that moving to Texas at this stage in her life, with its many attendant changes, may cause a disruption in the positive emotional and psychological progress she has made since her parents' deaths. Observing R.N.'s positive relationship with her current counselor, he opined she would have difficulty developing an equally positive relationship with a new counselor.
 {¶ 35} Further noting that one or the other of appellants was always home with the girls and that appellees both worked fulltime outside the home, he opined R.N. may have difficulty responding to an unfamiliar caretaker or babysitter. In addition, he conveyed some concern that R.N.'s ability to express and deal with the circumstances of her parents' deaths, including the ability to express anger at her father for causing the deaths, could be compromised if she lived in an environment, such as her father's family, where she did not believe she could freely express her concerns. For these reasons, Dr. Wenke opined it would be in R.N.'s best interest to live with appellants.
 {¶ 36} At appellees' request, Ambrose conducted a psychoeducational evaluation of R.C. and submitted a written report of her findings in July 2002. In conducting her evaluation, Ambrose reviewed R.C.'s school records, including Dr. Switkin's report, reviewed reports both Fox and Dr. Wenke prepared, and requested that appellants and appellees complete questionnaires concerning R.C. In addition, she interviewed R.C. and appellees.
 {¶ 37} Ambrose classified R.C. as learning disabled and recommended she receive educational services related to her learning disability. She opined R.C.'s special education needs have not been fully met in the past and expressed some concern whether a Montessori school was equipped to meet her special education needs. She noted, however, that public school systems are capable of meeting R.C.'s needs if the Montessori school cannot. She disagreed with Dr. Switkin's conclusion that R.C. would likely lose six months' academic development if she moved to Texas and changed schools. To the contrary, Ambrose testified R.C. would suffer no educational setback if appellees and the new school setting properly provided for her educational needs.
 {¶ 38} In addition to her testimony regarding R.C.'s educational needs, Ambrose testified concerning R.C.'s social, psychological and familial needs. In particular, she noted R.C. likes school, is very social, and appears to be comfortable with both sides of her family. R.C., however, continues to grieve the loss of her parents. Ambrose opined R.C. would benefit from significant exposure to an "intact family," including both a mother and a father in a home setting, as such would provide R.C. an increased sense of security, a positive role model for a healthy marriage, and gender-diverse parenting. Ambrose further noted moving and changing schools could positively impact R.C., especially if she were permitted to have ongoing contact with appellants and her Columbus friends. Although Ambrose acknowledged the possibility of problems associated with the girls living with the family of the person who was responsible for their mother's death, she opined such problems could be alleviated with some effort.
 {¶ 39} The GAL noted in her report that despite the parties' 2000 agreement, little has been done since 1999 to assist the girls in their transitions from Columbus to Texas and back. In particular, the GAL noted an underlying current of animosity between the parties for which neither side was fully to blame, but which contributes to a fairly serious lack of communication regarding the girls.
 {¶ 40} The GAL also reported concerns that in the years since the death of the girls' parents, appellees did not appear to have been actively involved in, or at least attempted to keep informed about, issues related to the girls' schooling, activities and counseling. The GAL suggested such inaction demonstrated a lack of planning skills necessary to help the girls smoothly transition to a new home and environment. The GAL also expressed concern that appellees' commitments to their jobs, family obligations, and community service may prohibit them from giving the girls the time and attention necessary to successfully transition to a new environment. In addition, the GAL noted the girls have become accustomed to at least one of the appellants being with them on a nearly full-time basis.
 {¶ 41} The GAL also articulated concern about R.C.'s educational issues and R.N.'s difficulty with new situations and new people. With regard to R.C., the GAL concluded that asking a child who has suffered educational difficulties to endure the additional burden of moving to a new home, school and community is patently contrary to her best interest. The GAL further concluded that given R.N.'s continuing need for counseling and her expressed concerns about meeting new people and experiencing new situations, she was not ready to make a permanent move to Texas.
 {¶ 42} The GAL further stated that while in appellants' care, the girls had been happy and healthy, had adjusted to their community, had established friendships, and had enjoyed school. Given their traumatic and tragic history, including their parents' divorce and deaths and the attendant multiple relocations, the GAL questioned the wisdom of requiring the girls to leave the home to which they had become accustomed. As such, the GAL recommended the girls' best interest would be served by continuing to live with appellants in Ohio, while maintaining ongoing and frequent contact with appellees and the rest of the paternal family.
 {¶ 43} R.C. 3109.04(F)(1) sets forth a nonexclusive list of considerations in determining best interest:
(a) The wishes of the child's parents regarding the child's care;
(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
(d) The child's adjustment to the child's home, school, and community;
(e) The mental and physical health of all persons involved in the situation;
(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;
(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;
(h) Whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;
(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;
(j) Whether either parent has established a residence or is planning to establish a residence out side of this state.
 {¶ 44} Appellants' argument that the magistrate failed to consider all the R.C. 3109.04 factors in determining the girls' best interest is unpersuasive. The magistrate considered each of the ten factors noted above, finding only R.C. 3109.04(F)(1)(c) through (f) applicable to the circumstances. In discussing those four applicable factors, the magistrate carefully reviewed all the testimony offered at the hearing.
 {¶ 45} With regard to R.C. 3109.04(F)(1)(c), the magistrate thoroughly examined the girls' interaction with both families, both prior to and following their parents' deaths. Specifically addressing appellants' interaction with the girls, the magistrate noted the girls have lived with them since shortly after their parents' deaths and have successfully integrated into their lives. The magistrate further noted Ernestine has sacrificed her independence in order to commit herself to raising the girls in a caring and loving home. The magistrate also noted Dara's obvious commitment to the girls, but recognized that she has been well-compensated for the time she spends with them, having received an annual salary of $35,000 for providing care for the girls. The magistrate also noted appellants have a relatively small extended family that does not interact in any significant way with the girls.
 {¶ 46} As to appellees' interaction with the girls, the magistrate noted that prior to their parents' deaths, the girls were acquainted with appellees from family events but did not have extensive, individual contact with them. Since their parents' deaths, however, the girls have spent considerably more time with appellees and seem to have developed a close, warm and loving relationship with them. The magistrate recognized R.N. is not as intimate with appellees as she is with appellants, but attributed that situation to R.N.'s shy nature and the minimal time she has spent with them compared to appellants. The magistrate further noted R.N. seems to have connected well with appellees' youngest son. The magistrate also observed that of all parties seeking custody of the girls, William Lee appears to have the closest relationship with R.C. The magistrate also found significant the large extended family available to the girls in Texas.
 {¶ 47} With regard to R.C. 3109.04(F)(1)(d), the magistrate noted the girls have adjusted well to their Columbus home, due in large part to appellants' concerted efforts to involve them in various activities both in and out of school. Noting the girls' initial difficulty in adjusting to their new school, the magistrate observed they now appear to be fairly well adjusted. With regard to their adjustment in the Texas environment, the magistrate found the girls have been involved in several recreational activities and have spent considerable time with their many cousins.
 {¶ 48} Regarding R.C. 3109.04(F)(1)(e), the magistrate first noted no psychological evaluations were conducted of the parties, nor were any requested. The magistrate thoroughly discussed the parties' ages, physical condition, and employment status, as well as the girls' physical and emotional health.
 {¶ 49} As to R.C. 3109.04(F)(1)(f), the magistrate expressed concerns about the parties' difficulties in maintaining open communications concerning the girls' activities, school progress and counseling. While recognizing how difficult the situation has been for everyone involved, the magistrate concluded the parties need to put their personal feelings aside and work together on developing a mutual respect for each other and an understanding of the importance of what each can bring to the girls.
 {¶ 50} Similarly unpersuasive is appellants' argument that the manifest weight of the evidence does not support the trial court's conclusion that an award of custody to appellees serves the girls' best interest. Following consideration of the four applicable best interest factors, the magistrate found both parties equally qualified to be the girls' custodians. While recognizing appellants' successful integration of the girls into a warm and loving home atmosphere, the magistrate observed that appellees offer a traditional family setting with considerable immediate and extended family interaction. The magistrate downplayed the GAL's concern that "committee," rather than appellees, made the paternal family's decisions concerning the girls, finding not only that appellees were capable of making appropriate parenting decisions on their own, but that involving extended family in decisions exhibited a commitment by the entire paternal family to provide for the girls' well-being.
 {¶ 51} The magistrate concluded the parties settled the custodial issues at the time they filed the Agreed Entry in September 2000, with both parties believing at that time the decision reached was in the girls' best interest. The magistrate noted the parties must learn to set aside their personal reservations and live by their agreement. Accordingly, the magistrate recommended the girls' best interest would be served by retaining custody with appellees.
 {¶ 52} The trial court reviewed the hearing evidence, along with the GAL's October 22, 2003 supplemental report, which was filed pursuant to the court's request that the GAL interview the children concerning their wishes. The essence of that report was that the girls continued to have positive relationships with both parties and were unwilling to voice a specific preference for living with either family.
 {¶ 53} When this court reviews the evidence, we cannot say that the trial court's decision was against the manifest weight of the evidence. Appellants argue it is unreasonable to now require the girls to move to Texas after they have lived with appellants for the last five years and have fully integrated into appellants' lives. While the evidence appears to substantiate appellants' claim that the girls are happy and healthy and integrated into their Columbus home, we recognize the girls' extended stay with appellants has resulted, in large part, from the protracted litigation in this case. As a result, the girls have not had the same opportunity to fully integrate into appellees' home. Despite their limited time with appellees, the girls seem to have bonded with them and integrated into appellees' lives.
 {¶ 54} As the trial court noted, both parties have opened their hearts and homes to the girls and are equally fit to raise them. For whatever reason, the girls simply will not express a preference for living with either family. Although appellants have taken excellent care of the girls, both physically and emotionally, appellees can provide a more traditional family, including a father figure the girls have lacked for many years, and a large extended family. Faced with a very difficult decision, the trial court simply determined the girls' best interest would be served by living with appellees, with frequent communication and substantial holiday and summer visitation with appellants. In light of all the factors the trial court was required to consider in determining the girls' best interest, the evidence does not so overwhelmingly favor appellants as to render the trial court's decision against the manifest weight of the evidence.
 {¶ 55} Finally, we disagree with appellants that the trial court abused its discretion in failing to consider and follow the recommendations of Dr. Wenke and the GAL that the best interest of the girls would be served by awarding custody to appellants. Initially, we note the magistrate's decision clearly states the evidence considered included the GAL report and Dr. Wenke's testimony. Further, the magistrate specifically referenced Dr. Wenke's testimony and the GAL report in her decision. As to the trial court's alleged abuse of discretion in failing to adopt their recommendations, we note that while both psychological experts and guardians ad litem play important roles in child custody matters and in evaluating the interest of children, their recommendations are not binding upon a trial court. The trial court must be free to evaluate all of the evidence and determine, based upon the entire record, the children's best interest. SeeSmith, supra; Shull v. Shull (July 31, 1990), Greene App. No. 89-CA-89. Appellants' third and fifth assignments of error are overruled.
 {¶ 56} By the fourth assignment of error, appellants contend the trial court abused its discretion in failing to consider the impact of the magistrate's "stale" decision on the girls' best interest and in refusing to allow the submission of additional testimony after the magistrate's hearing, but before final judgment on appellants' objections was rendered.
 {¶ 57} Turning first to the issue of staleness, appellants cite Knox v. Knox (1986), 26 Ohio App.3d 17 for the proposition that the magistrate's nine-month delay in issuing a decision may have rendered the hearing evidence inaccurate and irrelevant. InKnox, the court found that a trial court may abuse its discretion when it enters a judgment which is stale at the time of its entry. Id. at 20. In that case, the court reviewed a judgment in a contested divorce case where the lapse of time between the trial and the entry of judgment was 14 months. The court stated: "[d]uring such an extended period of time, the circumstances and environment of the parties may change radically. A decree not reflecting such changes may prejudice the parties, yielding an inequitable result. It happened here." Id. at 19.
 {¶ 58} The instant case is distinguishable from Knox. InKnox, the parties' economic circumstances changed during the delay, warranting a new trial based upon newly discovered evidence. Here, appellants assert only that the circumstances of the parties and children may have changed during the period between the hearing and the magistrate's decision, but offer no specific examples suggesting what circumstances changed, how the nine-month delay rendered the hearing evidence inaccurate or irrelevant, or how the delay prejudiced the parties or children.
 {¶ 59} We next address appellants' contention that the trial court abused its discretion in refusing to hear additional testimony prior to ruling on the objections to the magistrate's decision. Juv.R. 40(E)(4)(b) provides that the trial court shall rule on the objections and "[t]he court may adopt, reject, or modify the magistrate's decision, hear additional evidence, recommit the matter to the magistrate with instructions, or hear the matter itself." (Emphasis added.) The trial court is not required to hear additional evidence prior to ruling on objections. In re Williamson (Feb. 17, 2000), Franklin App. 99AP-440; In re Brock (Oct. 5, 1998), Warren App. No. CA98-03-027.
 {¶ 60} Here, appellants requested they be permitted to submit additional evidence concerning a change in circumstances in appellees' lifestyle: Elyria had been working in Chicago and returning home to Texas only on the weekends. Appellants argued this change in appellees' lifestyle was significant because in awarding custody to appellees, the magistrate found it important that they could provide the girls a traditional two-parent home. Appellants contend Elyria's extended absences from home undermine the magistrate's finding in this regard.
 {¶ 61} Appellants concede they became aware of the information regarding Elyria's employment circumstances through the October 2003 supplemental report of the GAL, which, we note, was generated at the request of the trial court. The report clearly states Elyria was working in Chicago and coming home only on weekends while the girls visited Texas in the summer of 2003. Although the trial court did not specifically address the change in Elyria's employment circumstances in its judgment, the court discussed the GAL's supplemental report and, accordingly, we presume the trial court considered the issue but, in its discretion, found it immaterial. Appellants' fourth assignment of error is overruled.
 {¶ 62} Having overruled appellants' six assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.
Judgment affirmed.
Petree and Klatt, JJ., concur.