[Cite as *Wallace v. Wallace*, 2023-Ohio-4777.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|  |  |  |
|---|---|---|
| MARIA R. WALLACE, | : | CASE NO. CA2023-03-030 |
| Appellant, | : | O P I N I O N |
|  | : | 12/28/2023 |
| - vs - | : |  |
|  | : |  |
| RACHEL L. WALLACE, | : |  |
| Appellee. | : |  |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. 18DR40305

Engel & Martin, LLC, and Mary K. Martin, for appellant.

Smith, Meier & Webb, and Mark D. Webb, for appellee.


**M. POWELL, J.**

{¶ 1} Appellant, Maria Wallace, appeals from a decision of the Warren County Court of Common Pleas, Domestic Relations Division, denying her request to relocate and change her child's school district, and awarding appellee, Rachel Wallace, additional parenting time. For the reasons set forth below, we affirm the domestic relations court's

decision.

## Facts and Procedural History

{¶ 2} Maria and Rachel were married in April 2015, in Frederick, Maryland. In 2018, Maria and Rachel filed a joint petition for dissolution of marriage with a separation agreement and shared parenting plan. The shared parenting plan set forth guidelines for the care of John, the couple's son, who was born in July 2015.[1] On June 22, 2018, the domestic relations court issued a decree of dissolution, which incorporated the parties' separation agreement and shared parenting plan into the court's order, as well as a decree of shared parenting.

{¶ 3} The shared parenting plan provided that both Maria and Rachel were the residential parents of John. Maria and Rachel were given equal parenting time throughout the week, aside from Saturdays, which alternated between the parties. At the time the shared parenting plan was prepared, Maria resided in Maineville, Ohio, while Rachel resided in Mason, Ohio. Although the shared parenting plan indicated that John could attend school in either parent's school system, Maria's residence was used for school registration purposes.

{¶ 4} Pursuant to the parties' agreement, neither party was permitted to relocate without first notifying the court. Specifically, the shared parenting plan stated that

> [i]f either parent desires to relocate, the relocating parent * * * must notify the court and their intent to relocate and provide the Court with a new residence address promptly. Said notice shall be filed with the clerk of Court and a copy forwarded to the other parent except as provided in Ohio Revised code section 3109.051(G)(2)(3) and (4). Upon receipt of the Notice, the Court on its own motion or the motion of the non-relocating parent may schedule a hearing with notice to both parents to determine whether it is in the best interest of the minor chil[d] to revise the

---

1. "John" is a pseudonym adopted in this opinion for purposes of privacy and readability. *See In re A.P.*, 12th Dist. Warren No. CA2022-01-002, 2022-Ohio-3181, ¶ 2, fn.1.

- 2 -

Standard Parenting Order for the minor child. The parenting plan further limited the parties' ability to move John from Warren County, and provides that

> [n]either party may remove the child from Warren County or its contiguous Ohio counties and establish residence for them without first obtaining a court order or an agreed entry permitting such removal.

{¶ 5} At some point, Rachel remarried and moved to Indiana, where she exercised her parenting time with John for some time. Thereafter, in May 2020, Maria moved the domestic relations court to modify the shared parenting plan. In her motion, Maria argued the parenting schedule should be modified to allow John to begin kindergarten at Kings local school district. Because Rachel was living in Indiana at the time, Maria claimed the current parenting schedule was not feasible, and that John should primarily reside with her. After a hearing, the court granted Maria's motion, and found it was in John's best interest to begin kindergarten at Kings School District in 2020. Maria was named the residential parent for school purposes as long as she resided in the Kings School District. The court also modified the shared parenting plan, and determined that John should reside primarily with Maria, and as long as Rachel lived in Indiana, Rachel would have parenting time on Wednesdays and every other weekend. If Rachel obtained a residence within 20 minutes of Maria's residence, the parties were to alternate parenting time, with Rachel having parenting time every Monday until Wednesday, and every other weekend.

{¶ 6} After this modification, Rachel began residing in Warren County on a part-time basis and exercised her parenting time at her sister's home. In September 2020, Maria moved the domestic relations court to clarify the term "residence" as used in the magistrate's August 2020 decision. Maria argued that, despite the close proximity of Rachel's sister's home to Maria's, Rachel's part-time residence in Warren County did not

qualify Rachel as an Ohio resident, and therefore, she was not entitled to equal parenting time as detailed in the August 2020 decision. After a hearing, the magistrate determined that Rachel could continue to reside and exercise her parenting time with John at her sister's home so long as it was in his best interest.

{¶ 7} In March 2021, Maria moved the domestic relations court to modify the shared parenting plan for a second time. In her motion, Maria claimed that, based upon recent events in Rachel's life, including her ongoing mental health and alcohol issues, as well as a recent arrest for "an OVI and Child Endangering," any parenting time with Rachel should be supervised and that Maria should have sole custody of John. The domestic relations court set the matter for a telephone conference and appointed a guardian ad litem ("GAL") to protect and act in the best interest of John.

{¶ 8} The GAL conducted an independent investigation into the matter and issued a report in July 2021. In her report, the GAL noted that Rachel's parenting time was to be supervised by Rachel's then-wife, Jessica, but recommended that her parenting time schedule continue unchanged. Thereafter, the parties requested the GAL to file a supplemental report addressing events in Rachel's life that occurred in August 2021, including a dispute with Jessica, which resulted in police involvement and Jessica filing for a divorce from Rachel. The GAL filed the supplemental report in November 2021, and the matter proceeded to a hearing on March 3, 2022.[2]

{¶ 9} At the hearing, the parties read an agreement onto the record. That agreement was memorialized into an agreed entry filed by the domestic relations court on April 13, 2022. Regarding parenting time, the agreed entry noted that Rachel was to have

---

2. The day before the hearing, the GAL emailed counsel to inform the parties that she would not be filing a new report, but recommended the parties "maintain the status quo," in that Rachel would continue to use a "scram device," as well as "BACtrac," and that her parenting time should remain supervised and in the same duration.

- 4 -

parenting time every Wednesday after school until 7:30 p.m., and every other weekend on Saturdays and Sundays from 9:00 a.m. until 7:30 pm. The agreed entry further stated that Rachel's parenting time was to be supervised by her sister, brother-in-law, or one of her parents. Rachel was not provided any overnight parenting time and was prohibited from driving John. The agreed entry further required Rachel to continue using a BACtrac device, including the picture function.

{¶ 10} The agreed entry noted that it resolved any and all other pending motions with prejudice, and that all other provisions of the existing shared parenting plan, as modified in August and October of 2020, remained in full force and effect. Notably, the agreed entry did not change or otherwise discuss the provisions limiting the parties' abilities to relocate or remove John from Warren County. Thus, pursuant to the agreed entry, those provisions remained in full effect moving forward.

{¶ 11} On May 17, 2022, Rachel filed a notice of intent to relocate with the domestic relations court, which provided the court and Maria with notice that Rachel intended to move to Maineville, Ohio at the end of May. Two days later, on May 19, 2022, Maria filed a notice of intent to relocate with the domestic relations court, which provided the court and Rachel with notice that Maria intended to move to Ashville, Ohio at the end of July.

{¶ 12} Shortly thereafter, on June 2, 2022, Rachel moved the court to modify the shared parenting plan and to prohibit the relocation of John. In addition to modifying the parenting time schedule and provisions, Rachel also requested the court to name her the residential parent of John for school purposes, or to prohibit Maria's proposed relocation. The court reappointed the GAL to act in the best interest of John and the matter proceeded to a two-day hearing on Rachel's motion.

**Evidence Presented at the Hearing**

{¶ 13} Rachel, Maria, and the GAL testified at the hearing. The GAL also submitted

a report to the court, in which she recommended that John should remain in Kings School District, and that Rachel's parenting time should slowly increase to Basic II, with unsupervised parenting time and overnights. The GAL's report, as well as her prior reports, were entered into evidence as exhibits. Also entered into evidence were, among other things, approximately 300 pages of communications between Rachel and Maria, various photographs and emails, John's school registration information, and medical information pertaining to Rachel.

{¶ 14} The testimony at the hearing revealed that in late December 2021, Maria became engaged to Derek, who she began dating in January of 2019.[3] Throughout the entirety of their relationship, Derek lived in Ashville, Ohio, a suburb near Columbus approximately one hour and thirty minutes from Maria's home in Maineville. Derek has two children of his own, aged 12 and 14 at the time of the hearing, who get along with John and have been involved in his life since mid-2019. Maria described John's relationship with Derek and his children as healthy, strong, and playful, and noted that John desires Derek's attention and speaks to him every day. Maria also explained that John wants to be around Derek and his children, and "wants the family dynamic that [they]'ve established together."

{¶ 15} On December 30, 2021, around the time Maria became engaged, Rachel questioned Maria via text message regarding Maria's long-term plans. In so doing, Rachel sent Maria the following text message:

> I'd like to ask what I did to you to have this much distain [sic] towards me to try to take him away from me. * * * Is it ultimately you want to move to Columbus with Derek? * * * So, how about you communicate what you want from here. I don't have any reason to stay in Cinci [sic] other than [John]."

Based upon this text message, Maria believed that Rachel was "seemingly" "willing to the

---

3. Derek and Maria were married on June 11, 2022, a few months prior to the initial hearing on Rachel's motion.

idea" of Maria moving to Columbus with John. Given her belief, Maria and Derek began "seriously" looking for a house in February 2022, a few weeks prior to the hearing on the parties' agreed entry.

{¶ 16} In May 2022, Maria and Derek purchased a home in Ashville, Ohio. The home is located in the Teays Valley School District ("Teays School District"), a district which Maria considers comparable to Kings School District. The home itself has enough bedrooms for each child to have their own room, and is in a quiet neighborhood across the street from the local high school with a big yard and play area for John.

{¶ 17} In April 2022, after submitting an offer on the home, Maria informed John that she and Derek had bought a home and would like to move. The following month, Maria filed her notice of intent to relocate with the court, which informed Rachel that Maria intended to move out of the Kings School District. Prior to that time, Maria had not mentioned moving John to Ashville to Rachel, nor had she mentioned it to the court. When asked about the delay in notifying the court of her intention to move, Maria explained that she waited until she had a definitive plan to present to the court and the GAL, and that she filed her notice within 48 hours of closing on her new home. Maria was adamant that she would not move if John could not change school districts.

{¶ 18} Regarding the relocation of John, Maria testified that it is in John's best interest to relocate with her to Ashville, as she feels she and Derek can provide a stable environment for John, "a family dynamic" that she and Derek have created. Maria stated that she and Derek had considered moving to Warren County, but it was not possible with Derek's work and his existing parenting schedule. Maria explained that it was not necessarily "easier" to disrupt Rachel's relationship with John than Derek's relationship with his children, but that "Rachel doesn't have any children to disrupt" and "it would be easier to facilitate that relationship" than to relocate Derek's older children. Maria clarified that

Rachel does not have any children other than John. Additionally, if John was permitted to relocate, Maria had the ability to facilitate all transportation for Rachel's parenting time.

**{¶ 19}** Maria testified that John was excited to move to his new house and wanted to move to Ashville. Maria discussed John's anxiety with his therapist, and as a result of that conversation, did not have any concerns with moving John to Ashville. Maria believed John would have no trouble assimilating into the Teays School District, as one of his friends from Ashville attended school there and Derek's children could attend school in the district at some point in the future. Additionally, John had changed schools previously without issue and would have to change schools every few years if he stayed in Kings School District. Maria acknowledged that she was a proponent of Kings School District in 2020, but claimed Teays was a comparable district.

**{¶ 20}** Regarding increasing Rachel's parenting time, Maria noted several concerns, including that Rachel was not exercising the entirety of her parenting time at the time of the hearing and that she was "in the middle of a criminal case for a sobriety issue that has been ongoing." Maria was also concerned about Rachel's living situation, as Rachel was residing in a coworker's basement while John had a room upstairs. Maria was also concerned that Rachel had stopped providing health updates to Maria, including updates regarding her mental health, sobriety, and physical health.

**{¶ 21}** Maria further testified that since their last hearing, Rachel had not attended all of John's extracurriculars or therapy appointments despite being aware they were occurring. Regarding John's therapy sessions, Maria acknowledged that only one parent could attend those sessions, and that she typically schedules and attends those appointments during her parenting time. Maria testified that she was not keeping John from Rachel and had tried to work with Rachel on their coparenting issues.

**{¶ 22}** Maria was also concerned with Rachel's ability to parent during her parenting

time if left unsupervised, and believed the parenting time should remain supervised while Rachel remained on probation. Ultimately, Maria wanted to see "consistency" with Rachel, including a period of no criminal involvement outside of her probationary period and evidence that Rachel was "moving towards a healthy lifestyle that's consistent and living on her own" before increasing her parenting time.

{¶ 23} Rachel, on the other hand, testified that she feels Maria is attempting to remove Rachel from John's life. Rachel provided several examples of this behavior at the hearing, including evidence that John had written his name with Derek's last name, which Maria did not correct, and that John had started calling Rachel, "Rachel," not "Mommy," because that is what "Mama," i.e., Maria, calls her. John's school forms were also modified to change Rachel's status from "Mother" to "Unidentified," while Maria remained identified as "Mother" and Derek was listed as "Stepfather." In addition, the GAL testified that Maria had shared unnecessary and inappropriate information with John's school and baseball coach regarding the court case and parenting schedule, which "paints a picture that [Rachel] should not be involved."

{¶ 24} Rachel testified that she intends to purchase a condo in the Kings School District, but was waiting for the court's decision on John's ability to relocate before purchasing anything. Rachel works at Costco and makes approximately $27,000 a year. She had leased an apartment on her own in the past and was a candidate for a promotion at the time of the hearing. Rachel testified that John needs stability, and that the last few years had been rough for him because she had not been in his life as much. Rachel indicated she was amenable to phasing into an increased parenting schedule, but believed John needed to have both parents involved and was ready for "mommy and [John]" time. Rachel described her relationship with John as very connected and close, but feels like she has not had the opportunity to be a parent to him due to the constant supervision of her

parenting time.

{¶ 25} At the hearing, it was revealed that Rachel was charged with an alcohol related offense in January 2022. Rachel's counsel stipulated that the matter remained pending and was set for trial on October 7, 2022. As evidence of her sobriety, Rachel testified she had utilized and paid for her BACtrac device since December 2021 without issue, although she acknowledged she had not demonstrated sobriety while unsupervised by the court.

{¶ 26} Rachel testified that she is concerned with her ability to communicate with Maria, as well as Maria's facilitation of Rachel's relationship with John. Rachel believes that if John moves further away, the communication with Maria will only get worse, and Rachel's relationship with John will worsen and deteriorate. The GAL testified similarly, and noted that in her experience, if there are issues with facilitating a relationship with one of the parents, distance makes those issues worse, which was a concern of hers in this case.

{¶ 27} As discussed in her report, the GAL testified that she did not recommend John relocating to Ashville and changing school districts. The GAL had been involved in the case for approximately one and one-half years prior to the hearing and had spoken to John regarding the move. During his conversation with the GAL, John disclosed that he was anxious about the move to Ashville and was nervous about making new friends at a new school. John informed the GAL that, although he was excited about his new room in his new home, he wished he could "pick up his house" and "put it back in Ohio." She understood John to mean that he wanted his new home to be in the Kings School District. The GAL testified that John's concerns were typical of any child entering a new school, which was why she was "not a fan of kids moving schools. * * * [I]t's really hard for them to start over."

{¶ 28} There was conflicting testimony presented regarding John's involvement with

the King's community. Maria initially claimed that John did not participate in any sort of Kings extracurricular programs and did not have a lot of playdates or overnights with his friends. Rachel, on the other hand, testified that John has a lot of friends that he spends time with, and is involved in football, karate, and baseball. Maria clarified that, although John was involved in karate at the time of the hearing, it was through a private academy, not the school district. Maria also acknowledged that John formerly played football and baseball with the Kings' program and was excited to start the baseball season soon after the hearing. The testimony also established that John was formerly engaged in counseling through his school, and since March 2022, had consistently attended counseling with a play therapist, "Ms. Cobin," who was located in the Cincinnati Area. Maria had historically been a proponent of Ms. Cobin and the GAL recommended that John continue his counseling with her in-person.

{¶ 29} The GAL also recommended slowly transitioning Rachel back to Basic II parenting time. The GAL testified that she was not sure what the parenting schedule should look like, but she did not see any reason why John could not have a supervised overnight visit with Rachel. The GAL indicated that Rachel had followed through with many of the GAL's recommendations, including following up with her medication management and her medical providers, as well as participating in BACtrac and family counseling. Although Rachel had shown nearly eight months of consistency at the time of the hearing, the GAL wanted to ensure things "continued that way" and recommended a slow transition with checks in place. The GAL also recommended Rachel continue using BACtrac and to follow through with all her treatment providers.

**The Domestic Relations Court's Decision**

{¶ 30} Following the hearing, the magistrate issued a decision granting Rachel's motion. In so doing, the magistrate found that, based upon the evidence before the court,

and the factors within R.C. 3109.04(F)(1), it was in John's best interest to remain in the King's local school district.[4] Specifically, the magistrate found that John is established in the community at Kings, and that he was doing well academically and socially. The magistrate noted that, it was not in John's best interest to remove him from the only school he has known, even if it has only been a few years, and place him in an unfamiliar school where it is unknown how John will do and if the school will provide John with the services he receives from his current school. The magistrate further found that part of Maria's testimony was less than credible, and that it was concerning that Maria did not disclose the possibility of relocating at the time of the agreed entry in April, despite searching for a home in a different school district prior to that time.

{¶ 31} Regarding Rachel's request for additional parenting time, the magistrate expanded Rachel's parenting time in accordance with the GAL's recommendation. In its decision, the magistrate provided a detailed timeline of how Rachel's parenting time should progress to unsupervised overnights by March 2023.

{¶ 32} On November 29, 2022, Maria filed objections to the magistrate's decision. In her objections, Maria argued the magistrate erred in awarding Rachel additional parenting time while prohibiting Maria from moving to Ashville with John. After an independent review, the domestic relations court overruled Maria's objections and adopted the magistrate's decision in its entirety.

**The Appeal**

{¶ 33} Maria now appeals, raising two assignments of error for our review.

{¶ 34} Assignment of Error No. 1:

---

4. The magistrate noted that, although Maria had not filed a motion to modify John's school district, it addressed the matter in light of the GAL's recommendation regarding the issue and the parties' presentation of evidence on the issue.

{¶ 35} THE TRIAL COURT'S DECISION TO DENY APPELLANT'S ABILITY TO RELOCATE WAS AN ABUSE OF DISCRETION AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 36} In her first assignment of error, Maria argues the domestic relations court abused its discretion when it denied Maria's ability to relocate to Ashville with John. Specifically, Maria argues the court's decision was not in John's best interest, and is therefore, against the manifest weight of the evidence, and must be reversed.

{¶ 37} It is well established that in reviewing a domestic relations issue, an appellate court employs an abuse of discretion standard of review. *Thompson v. Cannon*, 12th Dist. Fayette No. CA2015-02-003, 2015-Ohio-2893, ¶ 21; *Renner v. Renner*, 12th Dist. Clermont No. CA2014-01-004, 2014-Ohio-2237, ¶ 16. An abuse of discretion is more than an error in judgment or law; it connotes that the trial court's decision is arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "This highly deferential standard of review rests on the premise that the trial judge is in the best position to determine the credibility of witnesses because he or she is able to observe their demeanor, gestures, and attitude." *Rarden v. Rarden*, 12th Dist. Warren No. CA2013-06-054, 2013-Ohio-4985, ¶ 10. *Mack v. Mack*, 12th Dist. Butler No. CA2018-09-179, 2019-Ohio-2379, ¶ 14.

{¶ 38} A manifest weight challenge concerns "'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12 quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In a manifest weight challenge, an appellate court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed

and a new trial ordered." *Id.* at ¶ 20.  The presumption in weighing the evidence is in favor of the finder of fact.  *In re S.M.*, 12th Dist. Clermont No. CA2015-01-003, 2015-Ohio-2318, ¶ 10.  "If the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."  *Eastley* at ¶ 21.

{¶ 39} "Upon the filing of [a] notice of intent to relocate as provided in R.C. 3109.051(G)(1), the trial court must first determine whether any court orders, such as an agreed divorce decree, separation agreement, or shared parenting plan, limit the ability of the parent filing the notice to relocate."  *Zimmer v. Zimmer*, 10th Dist. Franklin No. 00AP-383, 2001 Ohio App. LEXIS 713, *3 (Feb. 27, 2001); *see also In re R.L.S.*, 12th Dist. Warren No. CA2013-12-117, 2014-Ohio-3294, ¶ 12. If there are no court orders limiting the ability of the parent to relocate, the court may proceed with a hearing to revise the visitation schedule as provided in R.C. 3109.051(G)(1).  *In re R.L.S.* at ¶ 12.  However, "[i]f a court order expressly or implicitly restricts [a] residential parent's ability to relocate, R.C. 3109.051(G)(1) does not govern the court's authority regarding relocation."  *Id.* at ¶ 13. Rather, under these circumstances, the court may prevent the parent from relocating and changing the child's school district where relocation is not in the children's best interests. *Id.*, citing *Zimmer* at *3-4.

{¶ 40} The burden rests with the party seeking to relocate to establish that relocation and a change of school districts is in the best interest of the child.  *Id.* at ¶ 14, citing *Salisbury v. Salisbury*, 11th Dist. Portage Nos. 2005-P-0010 and 2005-P-0084, 2006-Ohio-3543, ¶ 101.  The domestic relations court is permitted to look at the best interest factors set forth in R.C. 3109.04(F)(1) when the terms of the court order do not provide a standard for the trial court to employ in making its determination.  *Zimmer* at *4; *In re R.L.S.*, 2014-Ohio-3294 at ¶ 14.  These factors include, but are not limited to, the wishes of the child's parents

regarding the child's care; the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; the child's adjustment to the child's home, school, and community, the mental and physical health of all persons involved in the situation, and the parent more likely to honor and facilitate court-approved parenting time rights. R.C. 3109.04(F)(1)(a), (c)-(f).

{¶ 41} In the present case, the parties' shared parenting agreement, as modified by the court's entry in August 2020, provided that Maria was John's residential parent so long as she lived in Kings School District. If Maria wished to relocate or remove John from Warren County, she was required to provide notice to the court, which could in turn hold a hearing to determine if relocating was in John's best interest.

{¶ 42} Because Maria sought to relocate from Maineville to Ashville, and to change John's school district from Kings School District to Teays School District, she had the burden of demonstrating the move and change were in John's best interest. Having thoroughly reviewed the record, we find no error in the domestic relations court's denial of Maria's request to relocate John and enroll him in a new school district. The domestic relations court considered the best interest of John in making this determination, and the court's decision is supported by competent and credible evidence.

{¶ 43} Maria initially argues that Rachel has been inconsistent in the usage of her parenting time and in her relationship with John, and therefore, John should be permitted to move to Ashville, where Maria can provide a stable home life for John with Derek and his children. However, in only considering the home Maria could provide for John in Ashville, Maria ignores the evidence presented at the hearing that John would also benefit from a more consistent and stable relationship with Rachel, who is his mother, as well as her family located near Cincinnati.

{¶ 44} The testimony at trial established that if John were to move to Ashville, it would

strain his relationship with Rachel, as well as Rachel's co-parenting relationship with Maria. While Maria essentially claims Rachel could also move to Ashville or the Columbus area to facilitate her relationship with John, the record indicates Rachel could not feasibly do so. Additionally, if John were to relocate to Ashville permanently, the record indicates John would spend significant time driving to and from Rachel's to execute her parenting time and attend school. Although Maria testified she could transport John to facilitate Rachel's parenting time, such constant traveling is undoubtedly not in John's best interest. This is especially true given John's young age and need for stability.

{¶ 45} Maria also argues the magistrate did not consider John's wishes or the relationships he had created in Ashville. However, the record reflects the magistrate relied upon the GAL's testimony that John seemed apprehensive and anxious about changing school districts. Although there was evidence that John was excited for his new room and house, there was also testimony that he wished he could "move" the house to "Ohio." The GAL expressed additional concerns, which were reiterated in the magistrate's decision, that if John were to move, he would have to start over after developing a solid foundation at Kings. While Maria claims John is more accustomed to his life in Ashville, she appears to downplay John's involvement in the Kings' community. Notwithstanding that John has likely developed connections in the Ashville community, the record also reflects that John is connected to the Kings' community in most aspects of his life, including his education, his counseling, and his social life. Thus, we cannot say the court did not consider John's wishes or his connection to both communities when it denied Maria's relocation request.

{¶ 46} Lastly, Maria claims the Teays School District is comparable to Kings, and that the magistrate erred in concluding that John should not relocate because he may not have access to the same services if he moved. As noted above, Maria had the burden of demonstrating the move and change were in John's best interest. Aside from her testimony

that the districts were "comparable" according to "Niche.com," Maria did not produce any evidence relating to the services John could receive at the Teays School District, nor did she produce evidence relating to the district's quality of education, class size, or athletic programs. Maria also did not provide any plan for continuing John's counseling services to treat his anxiety. Without any additional evidence on the topic, it is unclear from the record if John could participate in the same activities, or have access to the same programs and services, if he moved to Ashville.

{¶ 47} In light of these variables, the court did not abuse its discretion in concluding a change in school districts was not in John's best interest at the time of the hearing. That is, based on all the foregoing, we conclude there is competent and credible evidence to support the domestic relations court's decision to deny Maria's request to relocate John to Ashville. We emphasize that our resolution of Maria's first assignment of error primarily turns upon the abuse of discretion standard of review. As our sister courts have noted,

> "[d]iscretion necessarily connotes a wide latitude of freedom of action on the part of the trial court, and a broad range of more or less tangible or quantifiable factors may enter into the trial court's determination. Simply put, two trial courts could reach opposite results on roughly similar facts and neither be guilty of an abuse of discretion."

*Eitel's Towing Serv. V. D H Trucking, Inc.*, 4th Dist. Ross No. 21CA3753, 2022-Ohio-1639, ¶ 36, citing *McGee v. C&S Lounge*, 108 Ohio App.3d 656, 661(10th Dist.1996). Consequently, while the members of this court may have reached a different result, the court's decision was not unreasonable or arbitrary, and we decline to find the domestic relations court's decision constituted an abuse of its discretion or was against the manifest weight of the evidence.

{¶ 48} Therefore, finding no merit to Maria's claims, her first assignment of error is overruled.

{¶ 49} Assignment of Error No. 2:

{¶ 50} THE TRIAL COURT'S DECISION TO GRANT APPELLEE ADDITIONAL PARENTING TIME WAS AN ABUSE OF DISCRETION AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 51} In her remaining assignment of error, Maria argues the domestic relations court abused its discretion in awarding Rachel additional parenting time. Maria first claims the magistrate erred in "rapidly" providing Rachel additional parenting time. Notwithstanding this argument, Maria contends the issue is moot given Rachel's apparent execution of the additional parenting time without issue. Maria also argues that Rachel should not be afforded additional parenting time if such additional parenting time is used as a basis to prevent John's relocation to Ashville.

{¶ 52} We review the modification of a parties' shared parenting plan regarding visitation or parenting time for an abuse of discretion. *Mack*, 2019-Ohio-2379 at ¶ 39. As noted above, an abuse of discretion is more than an error in judgment or law; it connotes that the trial court's decision is arbitrary, unreasonable, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219.

{¶ 53} As noted above, the domestic relations court modified the shared parenting agreement to transition Rachel to Basic II parenting time. Even when assuming the issue presented by Maria in this assignment of error is not moot, we find no abuse of discretion in the court's revision of the parenting time schedule. As discussed above, there was credible evidence presented at the hearing that it was in John's best interest to spend more time with Rachel. Not only is it clear Rachel desires to spend more time with John, the record reflects John desires, and could benefit from, additional time with Rachel as well. John is well bonded with Rachel, is affectionate with her, and is integrated into her life. Although Maria is concerned with Rachel's ability to remain consistent without potential

legal consequences, the record reflects Rachel was prepared to purchase her own home if John remained in Kings School District and was ready to provide stability and consistency for John if given the opportunity to do so. Moreover, the record indicates the court was aware of Rachel's pending criminal matters, but evidently gave more weight to the GAL's testimony that Rachel had demonstrated sufficient consistency in the several months leading up to the hearing, and was ready to transition to unsupervised parenting time.

{¶ 54} When this court reviews the evidence in its entirety, we conclude the domestic relations court did not abuse its discretion when it awarded Rachel additional parenting time. A domestic relations court must be free to evaluate all of the evidence and determine, based on the entire record, the child's best interest. *In re R.N.*, 10th Dist. Franklin No. 04AP-130, 2004-Ohio-4420, ¶ 55. That is what the domestic relations court did in this case. Although Maria is concerned with the "rapid" schedule set forth in the court's decision, the court's schedule is consistent with the recommendation of the GAL, and slowly transitions Rachel to unsupervised overnight parenting time with John within a five-month time frame. Such a schedule is neither arbitrary nor unreasonable, and is not contrary to John's best interest.

{¶ 55} In light of the foregoing, Maria's second assignment of error is overruled.

{¶ 56} Judgment affirmed.

PIPER, P.J., and BYRNE, J., concur.