OPINION *Page 2 
{¶ 1} Plaintiff-Appellant, Catherine Fordham, appeals the judgment of the Logan County Court of Common Pleas, Domestic Relations Division, granting her complaint for divorce from Defendant-Appellee, Stephen Fordham[1], and granting Stephen unsupervised visitation with the parties' minor child. On appeal, Catherine argues that the trial court's grant of visitation to Stephen was against the manifest weight of the evidence, contrary to law, an abuse of discretion, and not in the child's best interest. Based upon the following, we affirm the judgment of the trial court.
 {¶ 2} Catherine and Stephen were married in Ohio in September 2006 and have one minor child, Danielle Fordham (D.O.B. 10/6/06), born of the marriage.
 {¶ 3} In August 2007, Catherine filed a complaint for divorce. Additionally, Catherine sought an ex parte order granting her custody of Danielle on the basis that she had obtained a civil protection order ("CPO") against Stephen because he strangled her, fled the state with Danielle for two days, and fled from police officers after returning to Ohio. Thereafter, the trial court granted the ex parte order. *Page 3 
 {¶ 4} In March 2008, the case proceeded to final hearing on the matters of extension of the CPO and on the custody of Danielle. At the hearing, the following testimony was heard and facts adduced.
 {¶ 5} Catherine testified that she was a professor of pharmacy at Harding University in Arkansas; that she worked full time, with summers off; that, while she was at work, Danielle went to daycare; that she obtained a CPO against Stephen on July 25, 2007, because he strangled her, causing her to lose consciousness; that Stephen violated the CPO many times by calling her approximately four to six times a day; that he called her place of employment and "badgered" her secretaries and boss using a false name, causing her to lose her previous job at Ohio Northern University; that Stephen wrote letters to editors of scientific publications, posing as Catherine and damaging her professionally; that he contacted and badgered her relatives; that she was still afraid of Stephen; and, that she relocated and began working in Arkansas, where she continued to live.
 {¶ 6} Catherine then introduced recordings of voice messages Stephen had left her, in which he stated that she was not allowing him enough contact with Danielle; that Catherine's boss would not like the situation, implying that he would contact her employer; that Catherine was a "rat" and a "cancer" that he wanted to "cut out" from his body (Mar. 2008 hearing tr., p. 30); and, that God would "deal with [her] in a very powerful and real way." (Id.). Catherine also *Page 4 
introduced a recording in which Stephen stated that he wanted Catherine to help him out of the "funk" he was in and prevent him from "doing what I am about to go do" (Id. at 33); and, that he wanted to hold Danielle and kiss her "one last time." (Id.). Additionally, Catherine introduced emails Stephen had sent her stating that he was going to follow God's will; that "the spirit world whispers to him"; that she was possessed by Satan; and, that he was going to reveal her secrets to her family. Catherine testified that she had received approximately fifty emails from Stephen after she obtained the CPO; that the emails and phone messages made her believe that Stephen was mentally unstable and might commit suicide or harm Danielle. Catherine concluded that she believed she should be the sole residential parent because Stephen could abscond again with the child, and she did not believe he was a fit parent due to his mental instability.
 {¶ 7} In April 2008, the hearing continued, at which the following testimony was heard.
 {¶ 8} Tiffany Horn, the parties' former childcare provider, testified that Catherine was a very attentive and caring mother; that, when Stephen would take Danielle from her care for two hour visits, he would often return the child hungry and with soiled diapers; that he often appeared agitated and paranoid; that, after the incident during which Stephen left the state with Danielle, the child appeared to be afraid of men; and, that Stephen had called her in regards to Catherine's *Page 5 
parenting, asking "if there was anything [she] could turn into Children's Services for him." (Apr. 2008 hearing tr., p. 13).
 {¶ 9} Stephen testified that he was an unemployed engineer and received unemployment benefits; that he lived in a one-bedroom hotel room and had not acquired permanent housing because he was still searching for a job; that he had applied for jobs in the Midwest, but planned to eventually return to the Southern part of the country; that he was from Alabama and had no family relations in Ohio; that he had a minor son whom he had never met, but for whom he paid child support; that he had an adult daughter in Alabama with whom he had contact; that his mother lived in Alabama; and, that, if he obtained custody of Danielle and full time employment, he would arrange for child care.
 {¶ 10} Stephen continued that he was charged with domestic violence in July 2007; that, on the same date he was charged, he left the state with Danielle and planned to travel to his mother's home in Alabama; that he had a carseat for the child when he took the trip out of state, but the person from whom he acquired the carseat preferred to remain anonymous; that he could not remember the person's name, but it was a friend or neighbor; that he returned to Bellefontaine with the child after being contacted by the Bellefontaine Police Department; that, after turning Danielle over to Catherine, he ran from the police; that he was sentenced to five years of community control for escape by the Bellefontaine *Page 6 
Municipal Court; that he pleaded guilty to domestic violence and served a four-month jail term when Danielle was fourteen months old; and, that he had no contact with Danielle since January.
 {¶ 11} Stephen further testified that he did not know how many times he violated the CPO, but it was at least three times; that he did not recollect using a false name to contact Catherine at her place of employment; that he made only one $141 child support payment to Danielle; that he had been in psychological counseling over the past year and was taking sleeping pills and antidepressant medication; and, that he did not recall threatening to commit suicide, although he may have said something to Catherine alluding to that.
 {¶ 12} Stephen concluded that he believed it was in Danielle's best interest for him to have custody because he was a loving, caring father; because Catherine had a full time job and often worked on research while at home, requiring Danielle to be in child care; because he believed Catherine had postpartum depression or a thyroid condition; and, because he believed she consumed large amounts of alcohol and took diet pills.
 {¶ 13} Bridget Hawkins, Danielle's appointed guardian ad litem ("GAL"), testified that she believed Catherine should be the residential parent, with Stephen having visitation for one week every other month until Danielle reached school age; that she believed Danielle's visits with Stephen should take place at his *Page 7 
mother's or adult daughter's home in Alabama; that she recommended visitation take place at Stephen's mother's or adult daughter's home because they lived closer to Catherine's home in Arkansas than Ohio, and because Stephen lived in a hotel; that she did not see any reason the CPO should be extended to Danielle because, although Stephen "took off with" her, she was not aware of any physical harm to the child; that she assumed Stephen would not take off with the child again because he brought her back the first time; that she did not have any concerns about Stephen harming the child or doing anything dangerous; and, that she did not believe Stephen was ready to have custody of the child.
 {¶ 14} In June 2008, the trial court issued a judgment entry granting Catherine's complaint for divorce. Regarding allocation of parental rights and responsibilities, the trial court designated Catherine as Danielle's residential parent and legal custodian, and granted Stephen parenting time for one week, every other month, to be exercised at his mother's or his adult daughter's home in Alabama, until Danielle reached school-age.
 {¶ 15} It is from this judgment that Catherine appeals, presenting the following assignment of error for our review.
 THE TRIAL COURT DECISION GRANTING DEFENDANT/ APPELLEE EXTENDED PARENTING TIME WITH THE PARTIES' MINOR CHILD WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, CONTRARY TO LAW, AND/OR AN ABUSE OF DISCRETION, AND WAS NOT IN THE MINOR CHILD'S BEST INTEREST. *Page 8 
 {¶ 16} In her sole assignment of error, Catherine asserts that the trial court erred in granting Stephen one week of unsupervised parenting time every other month, because it was against the manifest weight of the evidence, contrary to law, an abuse of discretion, and was not in Danielle's best interest. Specifically, Catherine argues that the trial court failed to consider the factors set forth in R.C. 3109.04(F), as she contends its decision reflects that it did not consider that there was little relationship between Stephen and Danielle; that evidence demonstrated Stephen was mentally unstable; that evidence demonstrated Stephen had a criminal record and violated the CPO on multiple occasions; that evidence demonstrated Stephen was likely to flee with the child; and, that Stephen had no established suitable accommodations for the child and was planning to leave Ohio.
 {¶ 17} Initially, we note that R.C. 3109.04 is not applicable to this case, as that statute governs allocation of parental rights and responsibilities where a shared parenting plan is in place. Braatz v.Braatz (1999), 85 Ohio St.3d 40. R.C. 3109.051 is applicable to orders granting parenting time where no shared parenting plan is in place, as is the case here. See Id. Additionally, the factors set forth in R.C. 3109.04(F) and 3109.051(D) are not interchangeable. Id. at 44. Accordingly, we will analyze Catherine's argument as it pertains to the factors set forth in R.C. 3109.051(D). *Page 9 
 {¶ 18} A trial court's establishment of a non-residential parent's visitation rights is within its sound discretion, and will not be disturbed on appeal absent a showing of an abuse of discretion.Elson v. Elson, 3d Dist. No. 17-04-16, 2005-Ohio-3228, ¶ 11, citingAppleby v. Appleby (1986), 24 Ohio St.3d 39, 41; Booth v. Booth (1989),44 Ohio St.3d 142, 144. The trial court's discretion over visitation in this situation is broader than the court's discretion regarding child custody matters. Id., citing State ex rel. Scordato v. George (1981), 65 Ohio St.2d 128. Furthermore, the trial court must exercise its discretion in the best interest of the child. Bodine v. Bodine (1988),38 Ohio App.3d 173, 175.
 {¶ 19} Additionally, the trier of fact is in the best position to observe the witnesses, weigh evidence, and evaluate testimony. Clark v.Clark, 3d Dist. No. 14-06-56, 2007-Ohio-5771, ¶ 23, citing In reBrown (1994), 98 Ohio App.3d 337. Therefore, "`[a] reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not.'" Id., quoting SeasonsCoal Co., Inc. v. Cleveland (1984), 10 Ohio St.3d 77, 81.
 {¶ 20} R.C. 3109.051 governs visitation rights of non-residential parents and provides, in pertinent part, that: *Page 10 
 If a divorce * * * proceeding involves a child and if the court has not issued a shared parenting decree, the court * * *, in accordance with division (C) of this section, shall make a just and reasonable order or decree permitting each parent who is not the residential parent to have parenting time with the child at the time and under the conditions that the court directs, unless the court determines that it would not be in the best interest of the child to permit that parent to have parenting time with the child and includes in the journal its findings of fact and conclusions of law. Whenever possible, the order or decree permitting the parenting time shall ensure the opportunity for both parents to have frequent and continuing contact with the child, unless frequent and continuing contact by either parent with the child would not be in the best interest of the child.
R.C. 3109.051(A).
 {¶ 21} In determining whether to grant visitation to a non-residential parent, R.C. 3109.051(D) directs trial courts to consider the following factors, in part:
 (1) The prior interaction and interrelationships of the child with the child's parents * * * [;]
 (2) The geographical location of the residence of each parent and the distance between those residences * * * [;]
 (3) The child's and parents' available time, including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedule;
 (4) The age of the child;
 (5) The child's adjustment to home, school, and community;
 * * *
 (7) The health and safety of the child;
 * * *
 (9) The mental and physical health of all parties;
 * * *
 (11) In relation to parenting time, * * * whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child; *Page 11 
 (12) * * * [W]hether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent previously has been convicted of an offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that the person has acted in a manner resulting in a child being an abused child or a neglected child;
 * * *
 (14) Whether either parent has established a residence or is planning to establish a residence outside this state;
 * * *
 (16) Any other factor in the best interest of the child.
 (6) Finally, the Supreme Court of Ohio has stated that "[t]he better practice * * * is for the trial court, upon request by a party, to file the findings of fact and conclusions of law." Braatz, 85 Ohio St.3d at 45; see, also, Elson, 2005-Ohio-3228, at ¶ 13. However, as the Supreme Court did not hold that this was a requirement, this Court has found that a trial court is not required to make findings of fact and conclusions of law where the parties do not request them. Elson, supra; Long v. Long, 3d Dist. No. 9-00-58, 2000-Ohio-1801.
 (7) Here, Catherine argues that the trial court's decision reflects that it ignored her wishes regarding Danielle's care; that it failed to consider that there was little relationship between Stephen and Danielle, as he *Page 12 
went to jail for four months when she was fourteen months old and had only limited visitation thereafter; that it failed to consider that Stephen had mental health issues as demonstrated in his phone and email messages, his criminal record, and testimony from the parties' child care provider; and, that it failed to consider that Stephen had no permanent residence, increasing his flight risk.
 (8) Initially, we note that the record does not reflect that either party requested the trial court to file findings of fact and conclusions of law. As such, under Braatz, supra, the trial court was not required to do so. Catherine is correct in her assertions that the record contains evidence that Stephen pleaded guilty to domestic violence against her, left the state with Danielle, was convicted of escape, violated Catherine's CPO on multiple occasions, had no contact with Danielle since January 2008, was unemployed and living in a hotel, and may have exhibited mental health issues. However, the record also contains evidence that Stephen attended psychological counseling and was treated with antidepressants; that the GAL found no evidence of physical harm to Danielle when Stephen left the state with her; that she did not believe he would leave with her again; and, that she had no concerns about Stephen harming the child or doing anything dangerous. Given that the trial court was *Page 13 
presented with evidence concerning multiple factors in R.C. 3109.051(D), and that the trial court was in the best position to observe the witnesses, weigh the evidence, and evaluate the testimony, we cannot find that the trial court abused its broad discretion in granting Stephen visitation. Although this Court, in consideration of its opinion concerning the credibility of the witnesses and evidence submitted before the trial court, may have reached a different decision, this is not a legitimate ground for reversal. See Seasons Coal, supra.
 (9) Accordingly, we overrule Catherine's assignment of error.
 (10) Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
 Judgment Affirmed
WILLAMOWSKI, J., concurs.
[1] Defendant-Appellee, Stephen Fordham, did not file an appellate brief in this matter.