[Cite as *Walton v. Walton*, 2011-Ohio-2847.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
UNION COUNTY


MEGAN WALTON,

     PLAINTIFF-APPELLEE,                CASE NO. 14-10-21

     v.

JEREMIAH J. WALTON,                 O P I N I O N

     DEFENDANT-APPELLANT.


Appeal from Union County Common Pleas Court
Domestic Relations Division
Trial Court No. 05-DR-0092

Judgment Affirmed

Date of Decision:   June 13, 2011


APPEARANCES:

    *Andrea R. Yagoda*  for Appellant

    *Anthony W. Greco and Bryan D. Thomas*  for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Jeremiah Walton (hereinafter "Jeremiah"), appeals the Union County Court of Common Pleas' judgment denying his motion for a change in parenting time and granting plaintiff-appellee's, Megan Walton (k.n.a. Rausch) (hereinafter "Megan"), motion for attorney fees. For the reasons that follow, we affirm.

{¶2} The facts relevant to this appeal are stated as follows. The parties were divorced by an Agreed Judgment Entry Decree on September 14, 2005. Megan was designated the residential parent and legal custodian of the parties' minor child, Zander, born in 2004. Jeremiah was allocated parenting time on a specific schedule, which according to the Divorce Decree was supposed to change at the time the child began school. Additionally, a child support order was issued. Zander started attending school in August/September of 2009.

{¶3} On March 14, 2009, Jeremiah filed a Motion for Reallocation of Parental Rights and Responsibilities and requested that he be designated the school placement parent or, in the alternative, that his parenting times be expanded.

{¶4} On May 8, 2009, Clarence Mingo was appointed guardian ad litem ("GAL") in the case. Mingo later withdrew from the case prior to final

disposition, at which point in time, Clifton Valentine was appointed GAL for the remainder of the case.

{¶5} On June 8, 2009, Megan filed a motion seeking an increase in child support and filed a motion for attorney fees.

{¶6} On June 23, 2009, the trial court ordered, upon motion by the parties, psychological evaluations of the parties and an independent evaluation of the minor child.

{¶7} Jeremiah filed three motions for contempt on September 22 and 30, 2009, and October 29, 2009, respectively. Additionally, Jeremiah and his bank, Richwood Bank, filed motions for protective orders on September 3, 2009, and October 23, 2009, respectively.

{¶8} On October 22, 2009, Megan filed a motion for order to compel discovery and/or motion for sanctions and reasonable attorney fees. On January 6, 2010, Megan filed a supplemental motion for an order to compel discovery and/or motion for sanctions and reasonable attorney fees.

{¶9} The matter came for a final hearing on January 28-29, 2010 on the following matters: Jeremiah's motion for reallocation of parental rights; Megan's motion to compel; and Jeremiah's motions for contempt.

{¶10} On February 1, 2010, the magistrate issued an order compelling Jeremiah to provide Megan with all financial records for 2007-2009 used in the preparation of tax returns.

{¶11} On February 24, 2010, the magistrate's order and decision was filed denying Jeremiah's motion for reallocation of parental rights, denying Jeremiah's motion to modify parenting time, and denying Jeremiah's motions for contempt.

{¶12} On March 8, 2010, Jeremiah filed objections to the magistrate's decision.

{¶13} On March 15, 2010, Megan filed a motion for order to compel against Richwood Bank. On March 18, 2010, Megan filed a supplemental motion for order to compel Richwood Bank. On March 17, 2010, Jeremiah filed a child support guideline worksheet and request for deviation. On March 23, 2010, Megan filed a memorandum in opposition to Jeremiah's request for deviation. On April 7, 2010, the trial court ordered Richwood Bank to provide records. On April 13, 2010, Jeremiah filed a motion asking the trial court to set aside the order compelling Richwood Bank to provide records, but this motion was denied.

{¶14} On May 27, 2010, the matter proceeded to hearing on the motion to modify child support and the motion for attorney fees. On June 11, 2010, the magistrate issued its decision ordering an increase in Jeremiah's child support payments and awarding Megan attorney fees in the amount of $40,000.00.

{¶15} On June 23, 2010, Jeremiah filed objections to the magistrate's decision concerning the child support and attorney fees.

{¶16} On June 30, 2010, Jeremiah's objections to both decisions were overruled. On July 22, 2010 a final, appealable order was entered.

{¶17} Jeremiah now appeals and raises the following two assignments of error.

## ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT'S REFUSAL TO AWARD APPELLANT GREATER PARENTING TIMES WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND CONSTITUTED AN ABUSE OF DISCRETION.**

{¶18} In his first assignment of error, Jeremiah argues that the trial court abused its discretion in not granting him greater parenting time when the evidence was uncontroverted that more parenting time was in Zander's best interest.[1]

{¶19} A trial court's establishment of a non-residential parent's visitation rights is within its sound discretion and will not be disturbed on appeal absent a showing of an abuse of discretion. *Fordham v. Fordman*, 3d Dist. No. 8-08-17,

---

[1] Megan argues that Jeremiah failed to raise the issue of the expansion of parenting time in his original motion and thus claims that the issue is not properly before this Court. However, at the modification hearing, the trial court found that Jeremiah's motion did contain a request for a change in parenting time, despite the fact that the caption did not explicitly indicate such request. (Jan. 29, 2010 Tr. at 77). Nevertheless, the trial court found that in light of the prayer for relief language in the motion, as well as the evidence that had been presented at the hearing, the change in parenting time had been litigated by implied consent and it granted Jeremiah's oral request to litigate the issue regarding additional parenting time. (Id.). We find no error with the trial court's decision and find that the issue is properly before this Court to consider.

2009-Ohio-1915, ¶18, citing *Elson v. Elson,* 3d Dist. No. 17-04-16, 2005-Ohio-3228, ¶11, citing *Appleby v. Appleby* (1986), 24 Ohio St.3d 39, 41, 492 N.E.2d 831; *Booth v. Booth* (1989), 44 Ohio St.3d 142, 144, 541 N.E.2d 1028. An abuse of discretion suggests the trial court's decision is unreasonable or unconscionable. *Blakemore v. Blakemore* (1983) 5 Ohio St.3d 217, 219, 450 N.E.2d 1140. The trial court's discretion over visitation in this situation is broader than the court's discretion regarding child custody matters. *Elson*, 2005-Ohio-3228, at ¶11, citing *State ex rel. Scordato v. George* (1981), 65 Ohio St.2d 128, 419 N.E.2d 4. Furthermore, the trial court must exercise its discretion in the best interest of the child. *Bodine v. Bodine* (1988), 38 Ohio App.3d 173, 175, 528 N.E.2d 973.

{¶20} Additionally, we note that the trier of fact is in the best position to observe the witnesses, weigh evidence, and evaluate testimony. *Clark v. Clark*, 3d Dist. No. 14-06-56, 2007-Ohio-5771, ¶23, citing *In re Brown* (1994), 98 Ohio App.3d 337, 648 N.E.2d 576. Therefore, "'[a] reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not.'" Id., quoting *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 81, 461 N.E.2d 1273.

**{¶21}** R.C. 3109.051 governs visitation rights of non-residential parents

and provides, in pertinent part:

> **If a divorce * * * proceeding involves a child and if the court has not issued a shared parenting decree, the court * * *, in accordance with division (C) of this section, shall make a just and reasonable order or decree permitting each parent who is not the residential parent to have parenting time with the child at the time and under the conditions that the court directs, unless the court determines that it would not be in the best interest of the child to permit that parent to have parenting time with the child and includes in the journal its findings of fact and conclusions of law. Whenever possible, the order or decree permitting the parenting time shall ensure the opportunity for both parents to have frequent and continuing contact with the child, unless frequent and continuing contact by either parent with the child would not be in the best interest of the child.**

R.C. 3109.051(A). To determine whether a parenting schedule is in the child's

best interest, R.C. 3109.051(D) directs the trial court to consider the following

factors, in part:

> **(1) The prior interaction and interrelationships of the child with the child's parents, siblings, and other persons related by consanguinity or affinity, and with the person who requested companionship or visitation if that person is not a parent, sibling, or relative of the child;**
> **(2) The geographical location of the residence of each parent and the distance between those residences, and if the person is not a parent, the geographical location of that person's residence and the distance between that person's residence and the child's residence;**
> **(3) The child's and parents' available time, including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedule;**

**(4)  The age of the child;**
**(5)  The child's adjustment to home, school, and community;**
**\*\*\***
**(7)  The health and safety of the child;**
**(8)  The amount of time that will be available for the child to spend with siblings;**
**(9)  The mental and physical health of all parties;**
**(10) Each parent's willingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights, and with respect to a person who requested companionship or visitation, the willingness of that person to reschedule missed visitation;**
**\*\*\***
**(13) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;**
**\*\*\***
**(16) Any other factor in the best interest of the child.**

R.C. 3109.051(D).

{¶22} Jeremiah claims that the trial court erred in denying him greater parenting time when the magistrate failed to consider all of the relevant mandatory best interest factors. In particular, Jeremiah claims that the magistrate failed to consider evidence that there were concerns regarding the health and safety of the parties' minor child, and evidence regarding Megan's mental health issues testified to by David Lowenstein, Ph.D. However, we find Jeremiah's arguments unpersuasive.

{¶23} It is clear from the record that the magistrate did consider all of the applicable best interest factors in rendering its decision. In particular, with respect

to R.C. 3109.051(D)(1), the magistrate found that furthering Zander's relationships with his sister, Jeremiah's parents, and Zander's step-mother were beneficial and should be encouraged and nurtured. (Feb. 24, 2010 Mag. Dec. at 9). In addition, the magistrate acknowledged, pursuant to R.C. 3109.051(D)(2), that the geographical location of the residences of the parties would facilitate frequent companionship with both parents. (Id.). Furthermore, under R.C. 3109.051(D)(3), the magistrate found that both parties would have to make compromises in terms of their schedules when it came to visitation with the minor child. (Id.).

{¶24} Nevertheless, the magistrate also noted, pursuant to R.C. 3109.051(D)(9) & (10), that Jeremiah's frustration and suspicion of Megan created an "air of hostility and undermine[d] communication," and that any problems that had occurred with parenting time and schedules were mostly attributable to "frustration, anger and mistrust." (Id.). Significantly, with respect to R.C. 3109.051(D)(1), the magistrate noted that "there is considerable acrimony and mistrust between the parents that has contributed to Zander's anxiety to the decree [sic] that he is reluctant to express affection toward either parent in the presence of the other." (Id.). Moreover, under R.C. 3109.051(D)(16), the magistrate recognized that the first GAL recommended Jeremiah be given greater parenting time, although the magistrate believed that his recommendation "appeared

qualified and restrained because of the parties' lack of trust and inability to communicate." (Id. at 9-10). The magistrate also considered the second GAL's recommendation, who although he believed Jeremiah should be given a first right of refusal, could not recommend that a change in parenting time was in Zander's best interest. (Id.).

{¶25} Overall, after considering all of the applicable factors, the magistrate concluded, as follows:

> **Communication and cooperation of parents in raising their children are always in the best interest of a child; however, the tone of communications and the attitude in which communications are given and received dramatically affect the resultant cooperation or non-cooperation. * * * Such cooperation is at present no more than an aspiration. Indeed, it appears that suspicion and mistrust permeates the parents' interactions to the degree that every contact the child is exposed to causes the child to suffer anxiety. Notwithstanding Father's clear and deep love and commitment for his son, the animosity between the parents so injures the child that interaction between Mother and Father cannot be expanded at this time.**

(Feb. 24, 2010 Mag. Dec. at 10); (See, also, June 30, 2010 JE at 3).

{¶26} Despite these findings, Jeremiah claims that there were significant best interest factors that the magistrate did not consider. First, pursuant to R.C. 3109.051(D)(7), Jeremiah argues that he testified about concerns he had regarding Zander's health and safety, which were not considered by the trial court. However, after review of the record, we find that these concerns that Jeremiah

cites to merely center on a difference of opinion he had regarding Megan's decision to enroll Zander in a part-time versus a full-time kindergarten class. We fail to see how these concerns amount to ones that involve Zander's health and safety. Thus, we do not find that there was an abuse of discretion in failing to consider this factor.

{¶27} In addition, contrary to Jeremiah's claims that the trial court failed to consider Megan's mental health issues, relevant to R.C. 3109.051(D)(9) and testified to by Dr. Lowenstein, the record clearly indicates that Dr. Lowenstein found no mental health issues with either parent. As the magistrate asked during the hearing:

> **The Court: All right. As a result of all those testing, was there any psychopathology diagnosed on the part of any party?**
> **[Dr. Lowenstein]: No.**
> **The Court: Was there any personality disorders?**
> **[Dr. Lowenstein]: Nothing of significance.**
> **The Court: So basically the treatment you're talking about is essentially behavioral modification?**
> **[Dr. Lowenstein]: Parenting and with child guidance and behavioral modification, yes.**

(Jan. 29, 2010 Tr. at 30). Considering there were no significant mental health issues diagnosed for either party, we cannot find that there was an abuse of discretion with respect to this factor.

{¶28} Moreover, we do not find any merit with Jeremiah's argument that the second GAL, Mr. Valentine, mischaracterized Dr. Lowenstein's conclusions in

-11-

his GAL report to the trial court. We find that Mr. Valentine appropriately summarized Dr. Lowenstein's conclusions and even acknowledged Dr. Lowenstein's findings that Jeremiah should be more involved in the decision-making process regarding the well-being of Zander, and should be allowed to spend more time with Zander. (Defendant's Ex. O). We note that even though Mr. Valentine could not find a change in parenting time to be in Zander's best interest, he did recommend that a right of first refusal be given to Jeremiah. (Id.).

{¶29} Furthermore, we disagree with Jeremiah that the trial court abused its discretion in failing to consider the testimony and report from the psychologist, Dr. Lowenstein. Jeremiah claims that the trial court only focused on Dr. Lowenstein's recommendation that the parties needed to undergo therapy to address issues of behavioral modification. However, Jeremiah claims that Dr. Lowenstein also found no reason why Jeremiah should not be able to spend more time with Zander during the weekdays, especially considering the fact that both parties lived within the same school district. (Defendant's Ex. K). In addition, Jeremiah argues that Dr. Lowenstein noted that in his opinion Megan was attempting to alienate the minor child from Jeremiah and was excluding Jeremiah from the decision-making process regarding the minor child. (Id.).

{¶30} Initially, we note that the magistrate's decision clearly references Dr. Lowenstein's testimony and report. In its decision, the magistrate stated as

follows: "Dr. David Lowenstein recommended counseling for both parties in order to enhance their ability to communicate and cooperate in Zander's best interest. * * * The recommendation of Dr. Lowenstein was behavioral modification of the parties through therapy to enhance communication and effect cooperation." (Feb. 24, 2010 Mag. Dec. at 10).

{¶31} However, with respect to the trial court's alleged abuse of discretion in failing to adopt his recommendation, we note that while psychological experts play an important role in custody matters and in evaluating the interest of children, their recommendations are not binding upon a trial court. A trial court must be free to evaluate all of the evidence and determine, based on the entire record, the child's best interest. Here, the credibility of Dr. Lowenstein and the weight to be given to his testimony and report was a matter for the trial court, as the trier of fact, to determine, and we will not second guess its determination. *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212. See, also, *In re R.N.*, 10th Dist. No. 04AP-130, 2004-Ohio-4420, ¶55.

{¶32} Nevertheless, we wish to note that in this particular case, even though *one* of the recommendations Dr. Lowenstein made was that Jeremiah be given more parenting time, Dr. Lowenstein *also* acknowledged the parties apparent lack of trust and inability to communicate with one another. (Defendant's Ex. K). As Dr. Lowenstein stated in his report, "[i]t is clear from

this evaluation that *both* parents have a lack of trust for the other parent and this is especially evident when it comes to the decisions and responsibilities of raising their son. Both Jeremiah and Megan do not trust each other and have continued to display behaviors and reactions that continue to reinforce this mistrust." (Defendant's Ex. K at 15). Consequently, Dr. Lowenstein concluded:

> **Megan and Jeremiah seem to have never been able to communicate effectively with each other and feel that each other's family has interfered with the raising and caring of their son. They need to find ways to be able to deal with their son and his needs and find ways to work together to find compromises, etc. Zander may need continued services for many years and these services will be most effective when both parents are supportive and involved. If Megan and Jeremiah cannot resolve their differences effectively on their own, then they should seek assistance from a professional who can assist them in mediating their differences. The present mode of resolving these differences is not working for Zander and will only further disrupt his well-being in the future.**

(Id. at 16). The parties' animosity for one another and their inability to communicate, which again were found to be having direct consequences to their minor child, were the primary reasons why the magistrate and trial court found giving Jeremiah more parenting time would not be in Zander's best interest. (See Feb. 24, 2010 Mag. Dec. at 10); (See, also, June 30, 2010 JE at 3). As such, despite Dr. Lowenstein's recommendation that Jeremiah be given more parenting time, we cannot find that the trial court abused its discretion with respect to Dr. Lowenstein's testimony and report since Dr. Lowenstein clearly recognized that,

-14-

at this point in time, the parties' could not effectively communicate with one another.

{¶33} Finally, after reviewing the record, we do not believe that the trial court's decision in not awarding Jeremiah greater parenting time was against the manifest weight of the evidence. It is clear from the record that the parties have difficulty communicating and cooperating with one another. For example, verbal communications became so problematic for both sides that the parties resorted to communicating mostly through email. Not only did Dr. Lowenstein acknowledge the apparent animosity and lack of cooperation between Jeremiah and Megan, but both GALs, Jeremiah's mother, and Jeremiah's current wife recognized the difficulties the parties have in communicating and cooperating with one another with respect to Zander. This lack of trust and suspicious attitude with one another was directly affecting the parties' interactions with their child. In particular, there was evidence that Zander would shut down when he was around both parents at the same time and would be less affectionate towards both parents. Moreover, there was evidence that Zander would get very upset whenever he would have to leave directly from Megan's house, but that Zander was doing much better now that the parenting schedule has changed and he gets picked up by Jeremiah directly from school, instead of leaving from Megan's house.

**{¶34}** Jeremiah claims that his proposed schedule would further eliminate the contact he and Megan would have with one another. However, the fact remains that, at the time of the original divorce decree, the parties contemplated a change in parenting time when Zander began school and both agreed to this parenting schedule. Despite this agreement, Jeremiah filed his motion for reallocation of parental rights on March 24, 2009, thus, it is clear that Jeremiah did not even give the schedule change a chance to work or not to work. Even still, there was evidence that Zander was progressing and had transitioned smoothly under the new parenting schedule.

**{¶35}** Given all of the above, we find that there was competent, credible evidence to support the trial court's decision, and thus, that it was not against the manifest weight of the evidence. Furthermore, in light of the apparent animosity between the parents and their inability to communicate with one another, we cannot find that the trial court abused its discretion in denying Jeremiah's request for greater parenting time.

**{¶36}** Jeremiah's first assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ABUSED ITS DISCRETION AND ACTED CONTRARY TO LAW IN AWARDING APPELLEE FORTY THOUSAND DOLLARS ($40,000.00) IN ATTORNEY FEES.**

**{¶37}** In his second assignment of error, Jeremiah claims that the trial court abused its discretion in awarding Megan $40,000.00 in attorney fees when the award was inequitable under the circumstances.

**{¶38}** R.C. 3105.73 governs the award of attorney fees and litigation expenses in domestic relations cases and provides, in pertinent part:

> **In any post-decree motion or proceeding that arises out of an action for divorce, dissolution, legal separation, or annulment of marriage or an appeal of that motion or proceeding, the court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' income, the conduct of the parties, and any other relevant factors the court deems appropriate, but it may not consider the parties' assets.**

R.C. 3105.73(B).

**{¶39}** Awarding attorney fees under R.C. 3105.73 is within the sound discretion of the trial court. *Hutta v. Hutta*, 177 Ohio App.3d 414, 2008-Ohio-3756, 894 N.E.2d 1282, ¶46, citing *Howell v. Howell*, 167 Ohio App.3d 431, 2006-Ohio-3038, 855 N.E.2d 533. See, also, *Kinworthy v. Kinworthy*, 3d Dist. No. 1-10-23, 2010-Ohio-4547, ¶¶18-19. Therefore, we review the trial court's decision for an abuse of discretion. *Hutta*, 2008-Ohio-3756, at ¶46. An abuse of discretion is more than an error in judgment; it signifies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219. When applying an abuse of discretion standard, an appellate court may not

-17-

substitute its judgment for that of the trial court. *Berk v. Matthew* (1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301.

{¶40} First, Jeremiah argues that it was improper for the trial court to consider fees incurred prior to January 26, 2010, which was the date on which Megan filed her motion for attorney fees. However, not only does Jeremiah not provide any support for his position, but we find that Jeremiah failed to raise this issue below, and thus, has waived it for purposes of this appeal. See App.R. 12(A)(2); 16(A)(7).

{¶41} Nevertheless, Jeremiah also claims that the trial court impermissibly based its decision on his "strained" motion for reallocation of parental rights and, as a result, awarded Megan attorney fees as a way to punish him for filing his motions and to prevent him from filing similar motions in the future.

{¶42} We acknowledge that in concluding that Megan should be awarded attorney fees, the magistrate found that Jeremiah's motion for reallocation was "strained" and that there was "a real danger that this matter will return to court in the future." (June 11, 2010 Mag. Dec. at 12-13). However, in adopting the magistrate's decision, after conducting its own independent review of the record, the trial court reasoned that "Father elected to chart his own trial strategy including the employment of experts." (June 30, 2010 JE at 4-5). In addition, the trial court found that Jeremiah had failed to comply with the requirements of R.C.

3119.05 to document income for the purposes of computing child support and the prior orders of the court. (Id.). The trial court noted that because of Jeremiah's actions the time and expenses incurred in the case were greatly increased. (Id.). Finally, the trial court found that "Father's aggressive commitment to impose his will on Mother and the child is obvious," and that "Mother lacked the ability to defend herself and unless fees are awarded, she will be unable to reimburse her parents who funded her defense." (Id.). Consequently, the trial court found that $40,000.00 in attorney fees to Megan were equitable "based on the scope, sophistication and duration of the litigation initiated by Father." (Id.).

{¶43} After reviewing the record, we do not believe that the trial court abused its discretion in awarding Megan attorney fees. First of all, there was evidence of Jeremiah's aggressive trial strategy, and that he chose to utilize experts in furtherance of his case. For example, the record reflects that Jeremiah identified thirty witnesses in his notice of disclosure of witnesses and ultimately conducted seven depositions for purposes of trial, in comparison to the two witnesses deposed by Megan. In addition, Jeremiah chose to rely on his personal accountant, who resided in Florida, for purposes of establishing his finances in terms of the child support motion, and flew his accountant up for the hearing in May to discuss Jeremiah's finances.

{**¶44**} Furthermore, there was evidence that illustrated Jeremiah's uncooperative behavior in terms of providing his financial records to Megan. Not only did Jeremiah file a motion for protective order on September 3, 2009 in regards to his financial records, but he requested that his bank, Richwood Bank, similarly file a motion for protective order, which it did on October 23, 2009. Moreover, despite several discovery requests that specifically asked him to provide all financial records, Jeremiah chose, on his own accord, to only provide his tax returns. At the January 28, 2010 hearing, on cross-examination, Jeremiah was asked about the additional financial records he used because he was a self-employed farmer, and Jeremiah responded:

> **Q. Do you use Quicken or Quickbooks or any other computer program to assist you in keeping track of your checkbook?**
> **A. Yes. I use Quickbooks.**
> **Q. Did you provide a copy of that?**
> **A. No.**
> **Q. Why not?**
> **A. Well, I didn't think it was relevant.**
> **Q. You didn't think it was relevant?**
> **A. Well, I looked on line. It said you need my taxes.**
> **Q. I'm sorry?**
> **A. On line it says that you need my taxes.**
> **Q. On line?**
> **A. The Union County guidelines.**
> **Q. What are you looking at on line that you're referring to the instruction to respond to discovery?**
> **A. I don't know.**
> **Q. Well, you just testified that something you're looking at, you don't know all of a sudden?**

> **A. I looked in Union County guidelines for figuring child support and they said you need my taxes.**
> **Q. Okay.**
> **A. So that's what I gave you.**

(Jan. 28, 2010 Tr. at 157-58). Jeremiah was continually uncooperative during the proceedings, and at one point, the magistrate had to interject in the proceedings:

> **The Court: All right. But let me – the fact of the matter is that the witness has testified in a rather incredible manner that he has no real insight on what his income and expenses have been in the farm over the past couple of years. He has no knowledge, none whatsoever of the balances of his accounts. He unilaterally decided that the financial records maintained in Quicken were not relevant to this case. Quite candidly, the entire financial assets of the – of the father are why they otherwise wouldn't be relevant, the lack of candor, I'm going to give Mr. Greco a little bit more latitude. Because we're looking at – we are – we are in fact looking at what he is funding. For example, what are his crops in the bins now? How often is he selling those crops? What's the income being generated? When are those things being paid?**

(Id. at 196). Additionally, despite the trial court's order mandating Jeremiah to provide all financial records to Megan for purposes of calculating child support, we note that Megan still had to file an order to compel because Jeremiah had yet to provide all of his financial records to her by the date specified in the trial court's order. Even Jeremiah concedes in his appellate brief that the trial court may have acted appropriately based on the fact that it granted Megan's motion to compel. Nevertheless, while not all of Jeremiah's actions were in contravention to court orders, his actions certainly delayed and prolonged the duration of the child

-21-

support proceedings, which finally occurred on May 27, 2010, and increased the expenses incurred by Megan.

**{¶45}** Finally, we note that it is clear that there was a major disparity in income between Jeremiah and Megan. Jeremiah claims that Megan's lack of income was because she chose to be voluntarily unemployed by choosing to pursue a college degree, rather than obtaining employment. However, not only is the parties' income explicitly provided for in R.C. 3105.73 as a factor to consider, even Jeremiah concedes in his appellate brief that there was an actual disparity in the parties' income in this particular case. Furthermore, the disparity of income was only one of several reasons why the trial court found that it was equitable to award Megan attorney fees.

**{¶46}** According to the statutory language of R.C. 3105.73(B), the trial court is allowed to consider the parties' income, the conduct of the parties, and "any other relevant factors." Here, the trial court consider Jeremiah's aggressive trial strategy and tactics, Jeremiah's conduct, in particular his refusal to comply with the statutory mandates and court orders, and the disparity of the parties' income. Given the above evidence, we cannot say that the trial court abused its discretion in finding that an award of $40,000.00 to Megan in attorney fees was equitable in this particular case.

**{¶47}** Furthermore, while Jeremiah does not specifically raise an issue regarding the reasonableness of the award, we note that the record supports that an award of $40,000.00 was reasonable. At the January 29, 2010 hearing on Jeremiah's motions for reallocation of parent rights and change in parenting time, Megan testified that she had so far spent $40,000.00 in attorney fees. (Jan. 29, 2010 Tr. at 107). She stated that she had borrowed this amount from her parents to pay her attorney so far and, despite the fact that they were her parents, Megan said she intended to pay them back. (Id. at 107-08). In addition, at that same hearing, Megan's father, Jed Rausch, testified that Megan had so far borrowed $40,000.00 from him to pay her legal fees. (Id. at 124). Megan's father also stated that, even though Megan was his daughter, he expected her to repay that amount in the future. (Id.). Megan additionally presented evidence at the May 27, 2010 hearing, which concerned Megan's motions for child support and for attorney fees, that she had incurred, in total, $58,634.00 in attorney fees for legal representation in opposing Jeremiah's post-decree motions, seeking orders to compel discovery, and seeking a modification of child support. (May 27, 2010 Tr. at 12).

**{¶48}** It is clear that by awarding Megan $40,000.00 in attorney fees, the trial court imposed the amount of money Megan had spent in defending the motions filed by Jeremiah in regards to the reallocation of parental rights and

-23-

change in parenting time. Since the remainder of the proceedings dealt with Megan's motions for child support and attorney fees, the additional $18,000.00 was spent in litigating her motions as opposed to defending against Jeremiah's motions. As such, we believe that the amount awarded was reasonable under the circumstances.

{¶49} Overall, given the particular circumstances of this case, and the applicable statutory language, we cannot say that the trial court abused its discretion in awarding Megan $40,000.00 in attorney fees.

{¶50} Jeremiah's second assignment of error is, therefore, overruled.

{¶51} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW and WILLAMOWSKI, J.J., concur.**

**/jlr**